NOTICE

Decision filed 08/26/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 160207

NO. 5-16-0207

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 12-CF-1869 |
| | ) | |
| JOHN HOLMON III, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Justices Cates and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    This case involves the tragic beating death of a toddler. The defendant, John Holmon III, was charged with the child's murder, and the evidence at trial overwhelmingly supported his subsequent conviction on that charge. The defendant appeals, arguing that he was denied a fair trial due to numerous instances of prosecutorial misconduct during closing arguments. Although we agree with the defendant that the prosecutor made several blatantly improper comments during her closing argument, we do not find that reversal is warranted in light of the overwhelming evidence against the defendant, the lack of objection to most of the challenged remarks, and the fact that the trial court sustained objections to many of the most egregious of the challenged remarks. For these reasons, we affirm.

1

¶ 2    When the events at issue in this case took place, the defendant and his girlfriend, Dollie Rusher, lived with Dollie's 20-month-old son, Jasean Rusher, and her mother, Tommie Rusher. On the morning of September 10, 2012, the defendant and Dollie woke up early. They put little Jasean in his stroller and walked to the bus stop so that Dollie could catch a 6:33 a.m. bus for her first day of college. After Dollie got on the bus, the defendant took Jasean home. When they got there, Tommie was awake and getting ready to leave the house. She left the house at 7:10 a.m. The defendant gave Jasean his breakfast, changed his clothes, and put him in his crib. Then he went back to bed so he could get enough sleep before going to work. He set his alarm clock for 12:40 p.m.

¶ 3    The overwhelming evidence at trial showed that Jasean died sometime between 7:10 a.m. and 12:40 p.m. that day. Overwhelming evidence also showed that Jasean died due to extensive traumatic injuries inflicted on him during a beating. It is undisputed that the defendant was alone with Jasean during the relevant time period.

¶ 4    At trial, jurors saw a video-recorded deposition given by Tommie Rusher. She testified by deposition because she was diagnosed with cancer and died before trial. Tommie testified that on the morning Jasean died, she briefly saw Jasean and the defendant after they returned from taking Dollie to the bus stop. At that time, Jasean did not have any bruises. Tommie left the house at 7:10 a.m. to volunteer at a soup kitchen for homeless people. When she returned home at 12:15 p.m., she did not immediately see the defendant or Jasean. She made some coffee and went to her bedroom to put away her shoes. She testified that the defendant came into her bedroom carrying Jasean. He told her, "I don't know what's wrong. He was fine five minutes ago."

¶ 5    Tommie testified that Jasean was naked and cold and he looked like he was dead. He had cuts on his forehead and bruises on his arms. She testified that the defendant gave her two

different explanations for what had happened. He told her that Jasean must have fallen out of his crib. He also told her that the dogs had been rolling Jasean around on the floor. Tommie wrapped Jasean in a blanket and attempted to perform CPR on him. She told the defendant to call 9-1-1, but the defendant told her that his phone was lost. Tommie told him to call with her phone, but she stated that he still refused to do so. Tommie called 9-1-1 herself. A recording of that call was played for the jury. Tommie continued to perform CPR until medics arrived to transport Jasean to the emergency room.

¶ 6    Tommie acknowledged that she did not like the defendant. She also testified that, to her knowledge, the defendant had never previously struck Jasean. Finally, she testified that Jasean occasionally bumped his head when he fell or bumped into furniture.

¶ 7    Jurors also saw video recordings of the defendant's statements to police. Initially, he told police that he woke up some time between 8 a.m. and 9 a.m. to find Jasean in the living room playing with the dogs. He admitted that he did not find any bruises or cuts on Jasean at this time. The defendant told police that he put Jasean back in his crib and went back to sleep. He told them that he woke up again at 12:40 p.m. and found Jasean sitting in a plastic bucket. Jasean was wheezing and turning blue. The defendant stated that he immediately brought Jasean to Tommie. He denied harming Jasean. He speculated that the dogs may have dragged Jasean from his bedroom to the living room.

¶ 8    The defendant's story changed after police told him that Jasean had died. The defendant became upset and said that he did not mean for this to happen. He admitted that he gave Jasean a spanking. Police showed him photographs of Jasean's injuries. At this point, the defendant admitted that he gave Jasean three spankings. He explained that Jasean got out of his crib and pulled the tail of one of the dogs. He told police that he loved Jasean and that he would never

3

intentionally harm him. Later, the defendant admitted using a flip-flop to spank Jasean. He also admitted that he may have grabbed Jasean by the arms when picking him up from the stroller.

¶ 9    The defendant presented evidence at trial that Dollie had been diagnosed with a hereditary condition called Ehlers-Danlos syndrome. Ehlers-Danlos syndrome is a connective tissue disorder that causes hypermotility of the joints and fragility of the skin tissue. Minor trauma can cause severe wounds. See Mosby's Medical, Nursing, & Allied Health Dictionary 538 (5th ed. 1998). There was no evidence that Jasean had ever been diagnosed with Ehlers-Danlos syndrome. However, it can be passed on from parent to child. During his statements to police, the defendant indicated that both Dollie and her father were diagnosed with Ehlers-Danlos syndrome, and he suspected that Jasean might have it as well because he and Dollie both fell down a lot.

¶ 10    The State presented the testimony of three medical experts. Dr. Debabrata Ray is the emergency room doctor who examined Jasean. Dr. Ray observed bruising on Jasean's forehead, back, buttocks, and the right side of his body. He also observed abrasions on Jasean's eyelid, upper lip, shoulder, and buttocks, and blood on his upper lip. He testified that several of the bruises were shaped like human fingers or a human hand. Dr. Ray pronounced Jasean dead. He opined that Jasean died a few hours before he was brought to the emergency room. He concluded that Jasean died as a result of traumatic injuries to his head, face, and buttocks.

¶ 11    Dr. Raj Nanduri performed an autopsy on Jasean. She testified that she observed multiple visible contusions to the back of Jasean's head, his back, and the nape of his neck. She also observed abrasions, swelling, and contusions on Jasean's face. She opined that these injuries were consistent with being punched or slapped in the face. She also testified that there were 11 injuries to Jasean's head that were consistent with being punched by a closed fist. Dr. Nanduri observed bruising and contusions to Jasean's arms, buttocks, and the back of his thigh. She noted

4

that a contusion on the back of his thigh was consistent with being struck with a shoe or a flip-flop, and she noted that the bruises on his arms were consistent with being grabbed by the hands of an adult. Dr. Nanduri testified that she found 35 distinct injuries. However, she noted that some of the injuries were superimposed over others. As such, she explained, there may have been 50 or more blows in total.

¶ 12    Dr. Nanduri testified that none of these injuries were consistent with the type of accidental injuries toddlers typically sustain. She explained that she reached this conclusion due to the locations of the injuries. She further testified that she saw no evidence of dog bites. She determined that all of Jasean's injuries were sustained around the same time.

¶ 13    In addition to the extensive external injuries she saw, Dr. Nanduri found hemorrhaging inside Jasean's skull. She explained that this was caused by trauma. She concluded that the trauma to Jasean's head caused his death. Like Dr. Ray, Dr. Nanduri opined that Jasean died a few hours before arriving at the emergency room. Asked about the possible impact of Ehlers-Danlos syndrome, Dr. Nanduri explained that if Jasean had this disease, she would have observed older bruises.

¶ 14    Dr. Nanduri sent Jasean's brain to Dr. Mary Case for further analysis. Dr. Case testified that she found evidence of two different types of hemorrhaging in Jasean's brain, both of which likely resulted from inertial head trauma. She explained that when the head is moved quickly due to a significant amount of force, the brain can be detached from the dura, a membrane surrounding the brain. This in turn can sever the veins that bridge the brain and the dura. Dr. Case also found evidence of damage to the brain from a lack of oxygen. She noted, however, that there was no evidence of any prior incidents of hypoxia, meaning there were no prior episodes in which Jasean stopped breathing. She explained that such episodes would have caused damage to brain tissue, and such damage was not present.

¶ 15    Dr. Thomas Young, a board-certified clinical and forensic pathologist, testified as a retained expert for the defendant. He acknowledged that he was paid approximately $7000 for his services.

¶ 16    Dr. Young testified that, in forming his opinion, he reviewed the autopsy report of Dr. Nanduri, the neuropathology report of Dr. Case, the transcript of Tommie Rusher's deposition, Jasean's medical records, and the defendant's statements to police. He explained that he felt it was necessary to consider all of these sources of information because attempting to determine the cause of death without considering the statement of an eyewitness would be "a lot like looking at a broken glass in a window and thinking that you can tell how the window got broken just simply by looking at the broken glass." He opined that it was "better to listen to somebody who was there to actually see it." Dr. Young described his process of inquiry as listening "to what the witness said," comparing those statements to the autopsy results, and determining "if it makes sense or it doesn't make sense."

¶ 17    When asked his conclusion as to what caused Jasean's death, Dr. Young began by noting that the defendant reported finding the child sitting up, wheezing, and turning blue. Dr. Young concluded that this description was consistent with the medical evidence. He explained that infants and young children can experience apneic spells. An apneic spell is an incident in which the child stops breathing. Dr. Young noted that in such circumstances, adults usually panic, and their handling of the child can cause bruising. He explained that Jasean's hemorrhaging likely occurred because his heart continued to pump blood after he stopped breathing, but his blood vessels were unable to "contain blood very well" due to insufficient oxygen. He attributed the bruising on Jasean's buttocks to blood pooling in that area. We note that Dr. Nanduri specifically rejected this explanation in her testimony. She explained that if the bruising was caused by the pooling of blood, she would have seen bruising in the cleft, but she did not.

6

¶ 18 Dr. Young testified that had he performed the autopsy, he would have listed the cause of death as undetermined. He explained that although the apneic spell was a contributing cause of death, the reason for the apneic spell was not known. He further testified that it was not possible to determine the precise time of Jasean's death.

¶ 19 Some of the investigating officers also testified. Although we need not discuss their testimony in detail, it is relevant to note that the prosecutor asked one of the officers if he knew who paid for Jasean's funeral. Defense counsel initially objected on the grounds of relevance. However, she withdrew her objection, and the officer testified that the police union paid for the funeral.

¶ 20 Because the defendant challenges numerous remarks during the State's closing argument, we will set forth those remarks in detail. Assistant State's Attorney Jennifer Mudge began her argument by telling jurors that Jasean Rusher was 20 months old and his nickname was Bug. She then stated, "Opposing counsel told you in [her] opening statement that she didn't want you to jump to conclusions. And neither do we. *** But now you know. Now you know what happened."

¶ 21 Mudge argued that the timeline of events was undisputed. She reminded jurors that when Tommie Rusher left the house at 7:10 that morning, Jasean was happy and alive, but when she returned at 12:15 p.m., Jasean was dead. Mudge emphasized that the defendant was alone with Jasean during this time. She argued that the defendant beat Jasean to death. She continued, "What we don't know, what *** most of us probably don't want to know, is how many of those strikes he was awake for, how many of those strikes he was conscious for, and how long he lay in that bed before he died alone."

¶ 22 Next, Mudge recapped the testimony of several witnesses, including all of the medical witnesses. She reminded jurors that Dr. Ray concluded that Jasean had been abused. She discussed the testimony of Dr. Case, who found evidence of significant brain trauma.

¶ 23 Mudge went on to argue, "You also heard the defendant's statements. They can stand up here and yell at the police all day about what he said to them, but you heard it. You saw it and you heard it on the screen. You saw the progression of his stories." She then recounted several of the defendant's inconsistent claims about what took place the day Jasean was killed.

¶ 24 Mudge next discussed the testimony of Dr. Nanduri. She reminded jurors that Dr. Nanduri found 35 distinct injuries to Jasean Rusher's body but found no evidence of dog bites, brain bleed, or old injuries. She also reminded them that Dr. Nanduri opined that Jasean likely sustained more than 50 blows because several of the injuries were superimposed, meaning there were multiple blows to the same location.

¶ 25 Mudge further argued:

"The other witness you heard from is Dr. Thomas Young. Their witness. That's quite a story. That is that Jasean just stopped breathing and Tommie was doing some pretty rough CPR on him and that caused his injuries. I don't even have a better word for his testimony than it's a joke."

She told jurors that they would be instructed that it is their job to determine the credibility of witnesses. She told them that this instruction would be "very important when [jurors] are talking about Dr. Thomas Young's testimony, if in fact it deserves you even talking about." She went on to argue that Dr. Young was not a credible witness for three reasons: he was the only medical witness who formed an opinion without seeing Jasean's body, he was paid by the defendant, and he relied heavily on the account of events given by the defendant.

¶ 26    Emphasizing the last of these three reasons, Mudge reminded jurors of Dr. Young's testimony that he relied on the defendant's statements because he felt that the best information available to him was information provided by an eyewitness. Mudge acknowledged that "In a general term, yes, that's true." She went on to argue, however, that typically "the only eyewitnesses to murders are murderers." She then stated, "If what Dr. Young says is true, then we've all just learned a great lesson on how to commit a perfect murder; make sure nobody is watching but you, find your victim, kill them, round up a few thousand bucks, and call Dr. Young." She further argued, "The only question Dr. Young wasn't asked, that I submit to you we all probably want to know the answer to, is how does he sleep at night."

¶ 27    Mudge went on to discuss the State's burden of proving the defendant guilty. She reminded jurors that they were told during jury selection that the State had the burden of proving the defendant guilty beyond a reasonable doubt. She stated, "And that is absolutely right." She then argued that the State had done its job and proven the defendant guilty. She continued, "When he walked into this room, he was presumed innocent, and he was presumed innocent throughout the entire trial. That is correct. That is his right. Not today. He's been proven guilty."

¶ 28    Continuing on the same theme, Mudge reminded jurors that defense counsel told them during jury selection that the defense did not have an obligation to present any evidence at all. She stated, "And that's correct. They don't have to put on a shred of evidence. It is our burden." She went on to state, "But for people who came in here and told you that they don't have to do anything, they sure did throw a bunch of crap up on the wall for you to grasp on to." She then recounted the multiple theories offered by the defense to explain Jasean's death. She told jurors, "That is them trying to distract you from the facts of this case, the meat and potatoes of this case, which is three doctors that come in here and say, I saw him; he was abused; he was beaten to death."

¶ 29    At this point, defense counsel objected. She argued that Mudge's remark misstated the evidence. The court overruled the objection. Mudge concluded by once again telling jurors that she believed the State had proven its case and asking them to find the defendant guilty.

¶ 30    In the defendant's closing argument, counsel emphasized that the State must prove the defendant guilty beyond a reasonable doubt and argued that the evidence in this case was too "speculative" to meet this standard. She highlighted Dr. Nanduri's use of the phrase "consistent with." She reminded jurors that Dr. Nanduri used this phrase a lot, stating that Jasean's injuries were consistent with being hit with a fist or consistent with being hit with an object. She then argued, "What does consistent with really mean? Is that a fancy term doctors use to say it's possible?" Counsel further argued that, in assessing Dr. Nanduri's credibility as a witness, jurors should consider the following: "The police and Dr. Nanduri, do you think they're independent of each other? They work together. They're intertwined. The three Ps: the police, the prosecution, the pathologists."

¶ 31    Defense counsel further argued that the State attempted to sway jurors by eliciting testimony that the police union paid for Jasean's funeral. She also urged jurors to consider this evidence of bias on the part of the police. Finally, she argued that Dr. Young considered information from a broader range of sources than the other medical witnesses, including the police reports, the reports of Dr. Nanduri and Dr. Case, and Jasean's medical records.

¶ 32    Mudge began her rebuttal by stating, "Everything they just said totally means something if you get an instruction from [the trial judge] that when you enter the deliberation room, you are entering the Twilight Zone. Because it's a bunch of crap, and everybody in the room knows it." Mudge emphasized that Jasean was injured from head to toe. She argued:

> "[S]omebody that does the autopsy tells you about those injuries and his cause of death.
>
> And lawyers can get up and say it was a misdiagnosis ***. I've never in my life said that

I'm ashamed to be a lawyer. Because I'm proud to represent little boys like Jasean. But I'm ashamed right now. I'm ashamed about everything that happened this week. That they even can stand up and say that to you."

At this point, defense counsel objected, and the court sustained the objection.

¶ 33    Mudge went on to address defense counsel's argument about the evidence that the police union paid for Jasean's funeral. She stated, "It's the police's fault. They paid for the boy's funeral. Shame on them that they didn't want this kid in a morgue in a wooden box for the rest of his existence."

¶ 34    She next addressed Dr. Young's testimony. She argued as follows:

"Dr. Young had everything he needs to know to tell you the truth. Man, if that guy knows everything he needs to know to tell you the truth, we're all in trouble. For an extra seven thousand dollars, he probably would have come in here and told you I did it."

¶ 35    Next, Mudge responded to defense counsel's argument that the police, prosecutors, and pathologist were all working together. She asked jurors, "Hey, if someone in your family was murdered, *** if your child is murdered, wouldn't you want the prosecutors and the pathologists and the police to be working together to find out who did it? *** Don't you want that to happen if that's somebody in your family?"

¶ 36    Defense counsel objected, arguing that the comment was impermissible personalization. The court sustained the objection and told the jury to disregard the comment.

¶ 37    Mudge next reminded jurors that they had been instructed not to discuss the case with their friends and family members. However, she told them, "Tonight you can. When you reach a verdict, you can. When you go home, you can tell your spouses and your family and your children—." Defense counsel objected, again arguing that the comment was improper personalization.

11

¶ 38    The court sustained the objection, but Mudge did not move on to other topics. Instead, she argued:

> "After you can talk to your family about the case or if you're going to think about the facts of this case and relay what happens if you find the defendant not guilty, what went on in the trial? Well, we saw this dead baby. He was bruised from head to toe. It was really bad. A few doctors came in; worst case of child abuse they've ever seen. Cop said it was the worst they've ever seen. Baby was healthy until then. And it was real bad. So did you convict him? Nope."

Defense counsel objected. The court sustained the objection and told jurors to disregard Mudge's comments.

¶ 39    This, time, Mudge did move on to other topics. She spent a few minutes discussing the credibility of Dr. Young and Dr. Nanduri as witnesses. She then reminded jurors that they are not required to check their common sense at the door when they enter the jury room to deliberate. Next, she argued as follows:

> "Ladies and gentlemen, this case is incredibly clear. Jasean was left with someone who was supposed to take care of him. He was an innocent child, as all children are innocent. When he was left alone with the defendant, he was murdered. We, as a society, are obligated to protect our children. Much as it takes a village to raise a child—."

Defense counsel interjected, stating, "Your Honor, I'm going to object, same, personalization." The court sustained the objection, but Mudge continued to argue the same theme. She told jurors, "Jasean was not taken care of by the person who was supposed to watch after him. He was murdered by him."

¶ 40    Mudge then began to discuss a Billy Bob Thornton movie called *Sling Blade*. She explained that Billy Bob Thornton's character in the movie was a severely developmentally

12

delayed adult who befriended a 12-year-old boy. She told jurors that when the 12-year-old boy's mother began dating someone, it became apparent to Billy Bob Thornton's character that the new boyfriend was beating his young friend. Mudge continued, "And Billy Bob Thornton, being developmentally delayed, he predictably winds up killing mom's boyfriend—." Defense counsel objected, but the court overruled the objection.

¶ 41 Mudge continued her argument, stating, "He predictably kills mom's boyfriend. And at the end, when he knows that he is going to go to prison for it, he says, 'I don't think that bad stuff ought to happen to children. I think that the bad stuff ought to be saved—.' " Defense counsel objected again, and the court again overruled the objection. Mudge continued, " 'I think the bad stuff ought to be saved for the adults.' Well, so do I."

¶ 42 The jury found the defendant guilty of murder. The defendant filed a motion for a new trial. The court denied that motion. Following a hearing, the court sentenced the defendant to 70 years in prison. This appeal followed.

¶ 43 Before addressing the defendant's contentions, we briefly address a series of motions filed with this court by both parties. The State filed a motion to strike portions of the defendant's brief. In relevant part, the defendant argued in his brief that Assistant State's Attorney Mudge is a "repeat offender." He called our attention to three other appeals to this court in which Mudge served as prosecutor and engaged in similar misconduct. One of those appeals was decided in an unpublished order before the defendant filed his brief in this case; the other two were still pending. The defendant also called our attention to a radio broadcast in which it was revealed that Mudge had been promoted to a position in which she provided training to other assistant state's attorneys. The defendant argued that Mudge's conduct was especially problematic in light of both its repeated nature and her influence on other prosecutors.

13

¶ 44     In the State's motion to strike those portions of the defendant's brief, it argued that (1) it is improper to cite unpublished decisions and appellate briefs in undecided cases and (2) the defendant's arguments amounted to a personal attack on Jennifer Mudge. This court initially granted the motion to strike. Although the State's motion only addressed portions of the brief, we found that it would be more practical to strike the entire brief and direct the defendant to file a revised brief. The defendant filed a motion to reconsider that ruling, asserting that his attorney did not receive notice of the State's motion until after we ruled on it. We vacated our order striking the defendant's brief, reinstated his brief, and ordered the State's motion to strike taken with the case.

¶ 45     Subsequently, the State withdrew its motion to strike. We now grant the State's motion to withdraw. Thus, we need not rule on its motion to strike. We note, however, that we agree with the State that it is improper to cite unpublished decisions and appellate briefs in undecided appeals. We also note that although this court is aware of Assistant State's Attorney Mudge's conduct in cases that have recently been before this court, we must decide this appeal on its own merits. With this in mind, we turn our attention to the defendant's claims.

¶ 46     The defendant acknowledges that he did not object to most of the remarks he now challenges. Thus, his arguments with respect to those remarks are forfeited. This court may consider arguments that are otherwise forfeited under the plain-error doctrine. That doctrine allows us to overlook forfeiture of issues "when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first prong of the plain-error test is applicable in cases where the evidence is so closely balanced that the claimed errors alone were sufficient to "tip the scales of justice" against the defendant. *People v. Sebby*, 2017 IL 119445, ¶ 51. The second prong is applicable if any of the claimed errors were serious enough to

14

undermine the fairness of the defendant's trial or the integrity of the judicial process itself. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 47    In unusual cases, the cumulative effect of numerous errors can create a "pervasive pattern of unfair prejudice" despite the fact that none of the errors, standing alone, would be serious enough to warrant consideration under the second prong. *People v. Blue*, 189 Ill. 2d 99, 139 (2000). In such cases, we ask "whether a substantial right has been affected to such a degree that we cannot confidently state that [the] defendant's trial was fundamentally fair." *Id.* at 138. If the answer to that question is yes, reversal will be warranted even in the face of overwhelming evidence of the defendant's guilt. *Id.* at 140.

¶ 48    A defendant arguing that reversal of his conviction is warranted on the basis of improper closing argument faces a difficult burden. *People v. Gutierrez*, 402 Ill. App. 3d 866, 895 (2010). Even when a defendant objects at trial to all of the remarks he challenges on appeal, reversal is warranted only if those remarks resulted in substantial prejudice to the defendant. *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001). In other words, reversal is only warranted if the improper remarks were a material factor in the jury's verdict. *Gutierrez*, 402 Ill. App. 3d at 895. While it is difficult to overturn a conviction based solely on improper remarks during closing argument, it is not impossible. In some cases, improper arguments are prejudicial enough to undermine a defendant's substantial rights. If a prosecutor's remarks have the "effect of undermining the entire trial, reversal for a new trial is warranted." *People v. Brooks*, 345 Ill. App. 3d 945, 953 (2004).

¶ 49    Prosecutors are afforded wide latitude during closing argument. *Blue*, 189 Ill. 2d at 127. There are, however, limits to this latitude. Prosecutors are not permitted to misstate the law. See *Brooks*, 345 Ill. App. 3d at 950. Because the presumption of innocence is so central a principle in our criminal law, it is especially important that prosecutors do not present arguments incorrectly

limiting this principle. See, *e.g.*, *People v. Keene*, 169 Ill. 2d 1, 25-26 (1995) (finding it improper for a prosecutor to give jurors a "theatrical description of the stripping away of [the defendant's] presumption of innocence"); *Brooks*, 345 Ill. App. 3d at 950 (finding it improper for a prosecutor to tell jurors that the defendant's "cloak of innocence" is now gone).

¶ 50    Prosecutors may comment on the credibility or persuasiveness of the defendant's theory of the case. *Abadia*, 328 Ill. App. 3d at 678. However, they may not imply that defense counsel has deliberately presented a fabricated defense unless there is evidence to support this suggestion. *Id.* at 679. It is also highly improper to disparage the integrity of defense counsel. *Id.*

¶ 51    Prosecutors may comment on "the evil effects of the crime and urge the jury to administer the law without fear." *People v. Nicholas*, 218 Ill. 2d 104, 121-22 (2005). However, they must not engage in argument that serves no purpose other to inflame the passions of the jury. *Id.* at 121; *Blue*, 189 Ill. 2d at 128. In addressing a defendant's challenge to improper remarks during closing argument, we must consider the challenged remarks in the context of closing arguments as a whole. *Blue*, 189 Ill. 2d at 128.

¶ 52    The defendant argues that Mudge's remarks ran afoul of these principles in five ways: (1) she misstated the law by telling jurors that the defendant was no longer presumed innocent, (2) she disparaged defense counsel, (3) she portrayed herself as a champion of the victim, (4) she disparaged a defense witness, and (5) she inflamed the passions of the jurors and appealed to their emotions. The defendant acknowledges that his attorneys did not object to all of the remarks he challenges. He urges us to consider his arguments either under the plain-error doctrine or as ineffective assistance of counsel.

¶ 53    We must first consider whether the cumulative effect of the remarks challenged by the defendant would have required reversal had counsel objected to all of the challenged remarks. The first step in plain-error analysis is to determine whether any error occurred at all. *People v.*

16

*Walker*, 232 Ill. 2d 113, 124-25 (2009). If there is no reversible error, there can be no plain error. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's performance fell below an objective standard of reasonable representation and that (2) but for counsel's errors, a more favorable result was reasonably probable. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). If we conclude that the challenged remarks did not constitute a material factor in the jury's verdict, the defendant cannot meet his burden of demonstrating a reasonable probability of a different result. Thus, if we conclude that reversal would not have been warranted even if counsel had objected to all of the comments at issue, we need not consider the defendant's arguments regarding plain error or ineffective assistance of counsel.

¶ 54    The defendant first argues that Mudge misstated the law by telling jurors, "When [the defendant] walked into this room, he was presumed innocent, and he was presumed innocent throughout the entire trial. That is correct. That is his right. *Not today*. He's been proven guilty." (Emphasis added.) Although it was appropriate and permissible for Mudge to argue that the State had met its burden of proving the defendant guilty (see *People v. Cisewski*, 118 Ill. 2d 163, 178 (1987)), it was not appropriate for her to say, "Not today." Because that comment told jurors that the defendant would no longer enjoy the presumption of innocence during their deliberations, the comment misstated the law and was therefore improper. See *Brooks*, 345 Ill. App. 3d at 951.

¶ 55    Although the comment was improper, we find the potential for prejudice flowing from it to be minimal for two reasons. First, the comment was isolated. The fact that Mudge did not repeatedly tell jurors that the defendant was no longer presumed to be innocent ameliorated the potential for prejudice. See *Keene*, 169 Ill. 2d at 26. Second, the court correctly instructed jurors that the presumption of innocence remained with the defendant during their deliberations. Correct jury instructions are typically sufficient to cure any prejudice that might arise from an isolated misstatement such as this remark. See *Brooks*, 345 Ill. App. 3d at 950. We find it

17

inconceivable that this statement played any role in the jury's verdict, much less a material role. Thus, even if the defendant had objected, reversal would not have been warranted.

¶ 56　We will next consider the defendant's argument that Mudge disparaged defense counsel. As we discussed earlier, Mudge told jurors that the defense attorneys were "throwing a lot of crap" at them to try to distract them from the facts of the case, and that their arguments were "a bunch of crap" that made sense only if jurors were told that they were entering the Twilight Zone. She also told jurors that defense counsel's arguments made her ashamed to be an attorney. The court sustained defense counsel's objection to the last of these comments.

¶ 57　It is, of course, blatantly improper for a prosecutor to accuse defense counsel of fabricating a defense. It is also improper to accuse defense counsel of "attempting to create reasonable doubt by confusion, misrepresentation, or deception." *People v. Gonzalez*, 388 Ill. App. 3d 566, 590 (2008). However, prosecutors may comment on the credibility of the defendant and the persuasiveness of the defense theory of the case. *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000); *People v. Hudson*, 157 Ill. 2d 401, 444 (1993). Such comments must be supported by the evidence. See *Hudson*, 157 Ill. 2d at 444.

¶ 58　In challenging the credibility of the defense theory of the case, prosecutors must avoid accusing defense counsel of "any particular wrongdoing" or challenging "the motives or ethics of defense counsel." *Id.* at 443. They must also avoid shifting the jury's attention to counsel and away from the facts of the case. See *Kirchner*, 194 Ill. 2d at 548; *Gonzalez*, 388 Ill. App. 3d at 591. Whether particular remarks constitute proper commentary on the credibility of the defense theory of the case or an impermissible attack on the character of defense counsel often depends on the context. See *Kirchner*, 194 Ill. 2d at 549; *Hudson*, 157 Ill. 2d at 443.

¶ 59　Here, when Mudge initially told jurors that the defense threw "a bunch of crap up on the wall" for them to consider, she followed the comment with a discussion focusing on the

18

inconsistent explanations offered by the defense for Jasean's injuries, including the statements the defendant himself gave to police. With this context in mind, we consider the comment to be a permissible challenge to the defendant and his theory of the case.

¶ 60 The remainder of the remarks the defendant claims disparaged his attorneys were more problematic. Those remarks all came during rebuttal argument. Stating that defense counsel's argument would only make sense in the Twilight Zone because it was "a bunch of crap, and everybody in the room knows it" certainly seems to imply that the defendant's attorneys put forth an argument they knew to be false. Moreover, Mudge followed this comment almost immediately by telling jurors that she was ashamed to be an attorney because of what defense counsel argued, a comment we find to be particularly egregious. Considering these statements in this context, we find that they were all improper.

¶ 61 However, we do not believe the comments resulted in substantial prejudice to the defendant. For one thing, we reiterate that the trial court sustained a defense objection to Mudge's argument that defense counsel made her ashamed to be a lawyer. By doing so, the court cured any prejudice that might flow from that remark. See *People v. Carlson*, 92 Ill. 2d 440, 449 (1982). The other remarks, while improper, were less egregious, and we do not believe they were prejudicial enough to have been a material factor in the jury's verdict.

¶ 62 The defendant next argues that Mudge improperly cast herself as a champion for the young victim in this case. He points to her comment telling jurors that she was "proud to represent little boys like Jasean." Our supreme court has found similar comments to be improper. See *People v. Wheeler*, 226 Ill. 2d 92, 129 (2007). We note, however, that it was an isolated comment, unlike what occurred in *Wheeler*. There, the prosecutor's portrayal of himself as a " 'solitary figure' left to 'champion the deceased' " was a recurring theme. *Id.* More importantly,

19

in this case, the court sustained an objection to the comment, thereby curing the minimal prejudice that might otherwise have resulted from this remark. See *Carlson*, 92 Ill. 2d at 449.

¶ 63 We next consider the defendant's argument that Mudge improperly disparaged his expert witness, Dr. Young. We note that, as the State emphasizes, a prosecutor may properly comment on matters affecting the credibility of a witness, including the fact that the witness has been paid to testify. See *People v. Hickey*, 178 Ill. 2d 256, 291 (1997); *Hudson*, 157 Ill. 2d at 445. In this case, much of Mudge's commentary focused on valid reasons for jurors to find Dr. Young's testimony not to be credible. She told them that his opinion differed from that of the three other medical experts; that he was the only medical expert who never saw Jasean's body; that he was paid by the defendant; and that he relied on an account of events given by the defendant, who obviously had a motive to lie.

¶ 64 The defendant does not challenge those arguments. He does, however, challenge Mudge's remarks urging the jurors to draw certain conclusions from the facts she discussed. Specifically, she referred to Dr. Young's testimony as "ridiculous" and "a joke," and she suggested that jurors might not want to give any weight to his testimony. We do not believe these remarks strayed beyond the bounds of propriety. Mudge gave concrete reasons for jurors to find Dr. Young not to be credible at all and then urged them to make that finding.

¶ 65 In additional remarks, however, Mudge went much further. She told jurors that if they wanted "to commit a perfect murder," all they had to do was "round up a few thousand bucks[ ] and call Dr. Young." She also told them that for an additional $7000, Dr. Young could have been persuaded to testify that she killed Jasean, and she suggested that he should have been asked how he sleeps at night. We believe these remarks went well beyond the bounds of permissible argument. However, we do not believe they were prejudicial enough to have played a role in the jury's verdict or denied the defendant a fair trial.

¶ 66 Finally, the defendant challenges several additional remarks, arguing that they served no purpose other than to inflame the passions and emotions of the jury. In one such remark, Mudge responded to defense counsel's arguments concerning the evidence that the police union paid for Jasean's funeral. As noted earlier, counsel suggested that this was evidence of bias and argued that the State had elicited the evidence in an effort to sway jurors. In her rebuttal, Mudge commented, "Shame on them that they didn't want this kid in a morgue in a wooden box for the rest of his existence." Although it was reasonable for the prosecution to challenge defense counsel's accusation of bias, we do not believe it was proper to argue that Jasean's body would have remained in a wooden box in the morgue had the police union not paid for his funeral. For one thing, there was no evidence at trial to support this argument. See *People v. Glasper*, 234 Ill. 2d 173, 204 (2009) (noting that prosecutors may not argue facts not supported by the evidence). Moreover, the comment served no purpose other than to arouse the sympathy of the jurors. See *Nicholas*, 218 Ill. 2d at 121; *Blue*, 189 Ill. 2d at 128. We find the comment to be improper. However, it was an isolated comment, and we believe the potential for prejudice from this particular comment was minimal.

¶ 67 The next comment challenged by the defendant was the comment Mudge made referencing the movie *Sling Blade*. The court overruled two defense objections to this line of argument. On appeal, the defendant argues that it abused its discretion in so doing. We note that the comment can be interpreted two different ways. One way it can be read is as a prelude to introduce the quote, "I don't think bad stuff ought to happen to children. I think the bad stuff ought to be saved for the adults." On its own, that quote is not improper. As we noted earlier, prosecutors may comment on the evils of the crime at issue. See *Nicholas*, 218 Ill. 2d at 121-22. However, because Mudge also talked about the Billy Bob Thornton character "predictably" killing the mother's abusive boyfriend, the comment can also be read as a subtle appeal to jurors

to avenge the death of Jasean Rusher. Such appeals to the emotions of jurors are, of course, improper. See *id.* at 121; *Blue*, 189 Ill. 2d at 128.

¶ 68    We find the potential for prejudice from this comment to be quite minimal. We reach this conclusion largely because the suggestion that jurors should exact vengeance on the defendant is so subtle and indirect that it was likely missed by many jurors. It is also worth noting that many of the jurors were likely unfamiliar with the movie *Sling Blade*, which was released 20 years earlier.

¶ 69    We are far more troubled by the remainder of the remarks challenged by the defendant in support of his claim that Mudge "played the jury's emotions like a fiddle." In response to defense counsel's argument that the police, prosecutors, and pathologists all worked together, Mudge asked jurors, "[I]f someone in your family was murdered, *** wouldn't you want the prosecutors and the pathologists and the police to be working together to find out who did it?" The trial court sustained defense counsel's objection to this remark. Mudge told jurors that it is the obligation of society to protect children. The court again sustained an objection. Mudge also told jurors that they would be permitted to discuss the case with their families once they rendered a verdict, and she implied that they would be ashamed if they had to tell their family members that they voted to acquit the defendant. Again, the court sustained an objection. We find all of these comments—particularly the last—to be highly improper. However, the court minimized the potential for prejudice by sustaining objections. See *Carlson*, 92 Ill. 2d at 449.

¶ 70    We must now consider the cumulative effect of the comments challenged by the defendant. We do not believe that these comments warrant reversal, even when viewed in their entirety. We reach this conclusion for a simple reason. The evidence in this case was so overwhelming that we do not believe any rational jury would have returned a different verdict if none of the improper remarks had been made. The undisputed evidence showed that Jasean's

22

body was covered in dark bruises and wounds. The majority of these bruises were on the back of his head, his back, and his buttocks, although there were also hand-shaped bruises on his arms and injuries to his face. It is simply not plausible to believe these injuries resulted from Tommie performing CPR or the dogs playing with Jasean too roughly. Undisputed evidence showed that Jasean had no injuries in the morning, as even the defendant acknowledged, and the defendant admitted to police that he spanked Jasean multiple times and struck him with a shoe. In the face of this evidence, we do not believe even the cumulative effect of the challenged remarks was a material factor in the jury's verdict.

¶ 71    We emphasize, however, that our conclusion would have been different had there been any room for doubt of the defendant's guilt. It is blatantly improper for a prosecutor to urge jurors to find a defendant guilty so that they will not be ashamed to go home and tell their family members that they voted to acquit. In this case, Mudge not only made that argument, but she continued to make that argument after the court sustained an objection to it. We likewise find Mudge's argument that defense counsel's conduct made her "ashamed to be a lawyer" to be particularly egregious. Here, the court sustained objections to these comments and many of the other most egregious remarks, thereby minimizing the potential for prejudice. Moreover, as we have discussed, the evidence was so overwhelming that a different result is inconceivable. Although we affirm the defendant's conviction for these reasons, we wish to make it clear to prosecutors that closing arguments that exceed the bounds of propriety will not be tolerated.

¶ 72    For the foregoing reasons, we affirm the defendant's conviction.

¶ 73    Affirmed.

23

2019 IL App (5th) 160207

NO. 5-16-0207

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 12-CF-1869 |
| | ) | |
| JOHN HOLMON III, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**  **August 26, 2019**

_____

**Justices:**    Honorable Melissa A. Chapman, J.

Honorable Judy L. Cates, J., and
Honorable James R. Moore, J.
Concur

_____

**Attorneys**    James E. Chadd, State Appellate Defender, Ellen J. Curry, Deputy
**for**    Defender, Levi S. Harris, Assistant Appellate Defender, Office of the
**Appellant**    State Appellate Defender, Fifth Judicial District, 909 Water Tower Circle,
    Mt. Vernon, IL 62864

_____

**Attorneys**    Hon. Thomas D. Gibbons, State's Attorney, Madison County Courthouse,
**for**    157 N. Main Street, Suite 402, Edwardsville, IL 62025; Patrick Delfino,
**Appellee**    Director, Patrick D. Daly, Deputy Director, Sharon Shanahan, Staff
    Attorney, Office of the State's Attorneys Appellate Prosecutor, Fifth
    District Office, 730 E. Illinois Highway 15, Suite 2, Mt. Vernon, IL
    62864

_____