NOTICE
Decision filed 09/16/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 170139-U

NO. 5-17-0139

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 13-CF-964 |
| | ) | |
| LaROYCE McFADDEN, | ) | Honorable |
| | ) | Richard L. Tognarelli, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justice Barberis concurred in the judgment.
Justice Wharton dissented.

**ORDER**

¶ 1    *Held*:  Counsel did not provide ineffective assistance of counsel for failing: (1) to file a motion to suppress defendant's statements, (2) to present impeachment evidence and argument against gunshot residue test results, or (3) to object to certain evidence and comments of the State. The trial court's imposition of a 50-year sentence complied with the federal and state constitutions.

¶ 2    Defendant, LaRoyce McFadden, was convicted of first degree murder for killing a boy with a firearm when he was 17 years old. He appeals his conviction, arguing that (1) counsel was ineffective for failing to file a motion to suppress his statements to police, (2) he was prejudiced by the cumulative effect of additional errors by defense counsel, and (3) his sentence violates the federal and state constitutions.

1

¶ 3                                    I. BACKGROUND

¶ 4      On May 1, 2013, 13-year-old Clayton Veninga was shot to death while sitting on the porch of a friend's home in Granite City, Illinois. Three other persons—Mahmoud Ramlawi, known as Tudy; Tudy's mother, Tammy Ramlawi; and Blaine Buchanan—were all sitting on the front porch of the Ramlawis' home when the events at issue occurred. The following morning, after defendant's car broke down while driving back to Granite City from Centreville, Illinois, police picked defendant up and transported him to the Granite City Police Department.

¶ 5      Defendant was taken to an interview room at 12:20 in the afternoon. Detectives Brian Koberna and Gary Brooks entered the interview room shortly thereafter. Detective Brooks told defendant that he was being recorded, asked defendant for personal information, and then provided defendant with the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 6      Defendant told the detectives that he was aware that his name had "popped up" in relation to a murder in Granite City the previous night. Defendant acknowledged that he went to his mother's house in Granite City the previous evening to take a shower and change his clothes. We note that defendant's mother's house is located a few blocks from the Ramlawis' house. Defendant stated that he knew of Tudy and spoke with him once, but that he did not know him well. Defendant denied having a "beef" with Tudy but claimed that other people stole weed from Tudy's friends. He acknowledged that he walked down Tudy's street with his brother and cousin to get to his mother's house. He further acknowledged that he walked by two more times later that evening when he attempted to go to a friend's house but turned around and went home. Defendant stated that when he walked by Tudy's house, he noticed people on the front porch, but did not know who or how many people.

2

¶ 7     Approximately 30 minutes into the interview, Detective Brooks told defendant that there were many ways for police to verify what defendant told them. He told defendant that there were security cameras all over Granite City. He also indicated that other witnesses had already told police both that defendant was in the neighborhood when the murder occurred and that he had a "beef" with Tudy. Defendant continued to deny any involvement in the murder. Both detectives repeatedly stated that they already knew what happened and that defendant was not telling the whole truth.

¶ 8     Approximately 39 minutes into the interview, Detective Koberna asked defendant, "Did you mean for what happened to happen or was it an accident?" Defendant replied, "I know for a fact that I didn't do nothing." Detective Brooks then asked defendant if he had ever shot a gun. Defendant began to fidget with his shirt, but he indicated that he had shot a gun. When asked how recently he had shot a gun, defendant said the last time was probably the beginning of the previous year. Detective Brooks suggested that he might perform a gunshot residue test on defendant. At this point, defendant offered to take a lie detector test. Detective Brooks responded, "That's a possibility."

¶ 9     Next, defendant pulled his shirt up over his face and said something, but it is not clear on the recording what he said. Detective Brooks asked, "Excuse me?" Defendant began to answer, saying, "I don't wanna talk no more 'cause y'all make it seem like I just—" At this point, Detective Koberna interrupted, telling defendant, "I want to hear what happened; that's why we are here." The detectives continued to question defendant, asking him to start from the beginning.

¶ 10    Approximately 45 minutes into the interview, Detective Koberna stated that he had been doing this a long time, and indicated he believed that people were threatening defendant and

defendant just wanted to get them away. Defendant asked if he could just talk to Detective Brooks because he felt that Detective Koberna was being accusatory. Detective Koberna left the room.

¶ 11     One minute later, Detective Brad Skalsky entered the interview room, bringing with him a gunshot residue test kit. Detective Brooks asked defendant if he was willing to submit to a gunshot residue test. Initially, defendant agreed to do so. While Detective Brooks prepared the test, he continued to question defendant. In response to questioning about the test, defendant indicated that he used hand sanitizer after using the restroom just before the interview began. In response to questioning about the murder, defendant told Detective Brooks that the people sitting on the porch told him to leave the block.

¶ 12     Approximately 50 minutes into the interview, defendant asked, "Can I wait for my lawyer to do this? Can I get a lawyer? I don't even wanna talk no more." Detective Brooks replied, "Well that's up to you." Defendant said, "I just wanna call my mama and stuff and tell her to get me a lawyer." Detective Brooks asked defendant, "So you don't want to do this then?" Defendant indicated that he did not want to take the test and that he needed a lawyer because he did not know what to say.

¶ 13     The detectives left the room. Ten minutes later, Detective Brooks returned and told defendant that he would be kept in the interview room because there was no other place to put him. Detective Brooks also brought defendant a piece of pizza and a blanket. He told defendant to knock on the door if he needed anything. Detective Brooks then left. As soon as he closed the door, defendant knocked on the door, and Detective Brooks opened the door and walked back into the room. Defendant asked, "Is my mama here?" He then asked if Detective Brooks could call her and tell her to come. Detective Brooks stated that he did not know whether defendant's mother was there. He then said, "She's not going to be allowed to talk to you right now."

¶ 14     An hour later, Detective Brooks returned to the interview room and told defendant he would be kept in the interview room until police obtained a search warrant to conduct a gunshot residue test. Detective Brooks again instructed defendant to knock on the door if he needed anything. After being in the interview room for roughly four hours, Detective Brooks checked on defendant again and took defendant to go to the bathroom. Approximately 32 minutes later, Detective Brooks returned to perform the gunshot residue test. When he finished, Detective Brooks informed defendant that he was going to be held based on probable cause to believe that he was involved in the murder. Defendant was kept in the interview room for a total of 4 hours and 40 minutes before being formally arrested.

¶ 15     The following afternoon, around 4:20 p.m., defendant was returned to the interview room for another recorded interview with Detectives Brooks and Skalsky. Detective Brooks asked defendant, "You stated that you wanted to speak to me again, is that correct?" Defendant did not provide an audible response to the question, but he shook his head when asked if anyone threatened him. Detective Brooks provided a new set of *Miranda* warnings, and defendant signed the waiver form.

¶ 16     The interview began by Detective Brooks asking defendant to tell him what defendant wanted to talk to him about. After a lengthy pause, Detective Brooks told defendant that the story he told the previous day was "not complete." He also told defendant that police had talked to several witnesses, checked area surveillance cameras, and found defendant's shoeprint in the area. Defendant insisted that he had not done anything. Detective Brooks responded, "We know that's not true."

¶ 17     The detectives indicated that they did not believe defendant was a bad person or intended to kill the victim. They said they understood if defendant felt threatened and something went

5

wrong. Defendant responded that he guessed Tudy got him mixed up with someone else down the street who Tudy and his friends had problems with for stealing their weed. Defendant continued that the people on the porch started to threaten him when he walked by, so he jogged home to grab his brass knuckles. However, when defendant went back to Tudy's house, no one was there, and defendant went home. The detectives declined to accept defendant's story and stated that defendant either had a gun or knew someone who did have a gun. Defendant stated that the cameras in the area would confirm he did not have a gun. The detectives said that Tudy was talking for defendant and asked him if he wanted to share his side of the story. Defendant replied, "I'm telling the truth."

¶ 18 Approximately 22 minutes into the interview, the detectives indicated that defendant's mother was at the police station earlier that day. Defendant then asked, "If I do y'all a favor, could y'all do me a favor?" Asked to clarify, defendant said, "Just call my mama." Detective Brooks asked, "What do you mean by doing us a favor?" Defendant did not respond. Detective Skalsky indicated that they could arrange a call, but then Detective Brooks asked defendant whether he would tell his mother the truth. Detective Brooks further stated, "I wanna know from you right now." Defendant stated multiple times that he just wanted to talk to his mother. He began rocking back and forth in his chair. Detective Brooks left the room, telling defendant that he was going to inquire about calling his mother.

¶ 19 Detective Skalsky said that defendant should eat before his food got cold, but defendant stated, "I'm good." Defendant continued to deny having a gun and asked if he could take a lie detector test. Defendant again indicated that the detective should review the cameras because they would tell the truth. Detective Skalsky told defendant that he would never reveal everything he knew or how he knew, and that he wanted defendant to tell the truth. Defendant then stated, "I just

6

wanna see my family." He told Detective Skalsky, "After that, I'll tell y'all." Detective Skalsky then left the room.

¶ 20    Shortly thereafter, both detectives returned to the interview room. Detective Brooks told defendant they would be able to find his mother. However, he asked, "I'm just curious, what is it you want to talk to her about?" In response, defendant said that he wanted to see his mother and his brothers before he was "shipped off."

¶ 21    The detectives continued to question defendant, indicating that they knew defendant had a gun. Defendant continued to deny involvement in the murder but stated that "they" chased him with a gun before. Asked if he was sorry, defendant stated, "I didn't do it but I'm sorry for what happened to those kids." Detective Brooks stated that they needed to hear the truth. He further implied he understood that defendant need to protect himself because there were four people against one person. Defendant then stated that there were way more than four people on the porch. Detective Brooks asked if there were 10 people. Defendant responded, "I don't know but there was way more than four."

¶ 22    Although he did not admit being the shooter, approximately 40 minutes into the interview, defendant stated, "My life is over." He explained that he was afraid he would spend the rest of his life in jail and that people would think he was a "cold-blooded killer" because the police had charged him with murder. Detective Brooks told defendant that he looked "like that cold-blooded killer we keep talking about" because he was not telling the police his side of the story.

¶ 23    The detectives continued questioning defendant. Defendant asked multiple times to speak to his mother and his brothers; however, the detectives ignored these requests. Detective Brooks stated:

7

"Let me explain to you the problem, okay. I can't make you promises. I can't—I can't sit here and tell you, hey, if I let you talk to your mom, then you—you gotta tell me the truth. And I can't sit here and say, hey, I'll bring your mom in here, and then you'll tell me the truth. Because that—that makes it look like I'm making a promise or I'm coercing you, okay. Do you know what that means? Like I'm—like I'm making you a promise or like I'm telling you, hey, if you don't tell me the truth, I won't let you talk to your mom. Do you understand what I'm saying? And I can't do that. I need you to tell me the truth because you want to tell me the truth. Okay. It can't be, hey, if you let me talk to my mom, I'm—I—I'll tell you the truth. I need you to tell me the truth man."

Detective Brooks told defendant that his mother and one of his brothers were at the police station earlier, but he did not know where they were now.

¶ 24    The detectives continued to question defendant, who continued to deny his involvement in the shooting until approximately an hour and five minutes into the interview. At that point, defendant said, "Just tell his mama I'm sorry." Defendant subsequently admitted that he had a gun with him due to a previous encounter with someone who lived in the Ramlawi house. He explained that people riding in a red truck "pulled up on" him, called him the N-word, and threatened him. It is not clear how many people were in the truck or how many times this occurred, but defendant identified Tudy's sister, Sarah, as the person who was "always" in the passenger seat. When asked if he knew why they threatened him, defendant said that "somebody stole their weed or something," and they may have believed that he was the person who took it. Defendant stated that he used a revolver with .22 caliber bullets.

¶ 25    Defendant again asked to call his mother, but Detective Brooks told him that he needed to tell them "the rest of this story" first. Defendant then admitted that he shot towards the house to scare the people who were on the porch so they would leave him alone. By demonstration, defendant indicated that he raised his arm to a parallel position to the ground but tilted his wrist up to shoot above the house. He stated multiple times that he did not know how Clayton got hit. Defendant stated that he could not explain exactly where he was standing when he shot the gun, but that he could show the detectives. Defendant then admitted that he threw the gun out the window of his car on his way back to Centreville, where he was staying with his aunt. He also agreed to show the detectives where he threw the gun. Officer Skalsky left for a brief moment, then came back and asked defendant if he had a hoodie because officers recovered one from his house. Defendant said "yes" and also confirmed it was the hoodie he wore on the night of the shooting.

¶ 26    Thereafter, both officers left the room. Once they left, defendant began to pace the room. Detective Brooks returned and informed defendant that they were going to set up a transport to try to find the gun. When asked if he needed anything, defendant stated "my family." Detective Brooks told him to relax and hang in there. Shortly after Detective Brooks left the room, defendant flipped over a chair. Detective Brooks again returned and asked defendant to calm down because he did not want to have to put defendant back in his cell. Detective Brooks then got defendant an extra blanket. After a total of an hour and 50 minutes in the interview room, defendant was transported to various locations to show the officers where he shot and discarded the gun.

¶ 27    Detective Brooks testified at the grand jury. Pertinent to this appeal, Detective Brooks stated that a witness advised of the location of the gunshots and shell casings were located in that area. Detective Brooks averred that a .22 caliber bullet was found in the victim's body. Detective

9

Brooks also stated that no one saw defendant shoot the gun, and that area where the shooting occurred was very dark with insufficient lighting.

¶ 28    Defendant was tried by jury for the first degree murder. At trial, all three individuals who were on the front porch when the victim was shot testified. We note the precise timing of the following events is not entirely clear from the witnesses' testimonies.

¶ 29    Blaine Buchanan testified that after spending most of the evening with the victim, they ended up sitting on Mahmoud "Tudy" Ramlawi's front porch. He stated that initially there were also four other people on the front porch—Tudy; his mother, Tammy; his sister, Sarah, and Sahem. However, Sarah and Sahem went inside soon after Buchanan and the victim arrived. Asked to describe what happened, Buchanan said, "Dude walk past the first time and he stop, bend down, put something in his shoes, like he was tucking something in his shoe." At the time, Buchanan did not know who the individual was, but he described him as a young, black man with dreadlocks and a twitching eye, who was wearing black pants, a black hoodie, and black Nike boots.

¶ 30    Buchanan testified that defendant walked past a second time with two or three other males. According to Buchanan, when defendant walked past a third time, Tudy said, "Quit walking up my street," and defendant responded, "bro, chill out before I hand you some." Then, defendant and the people left. Buchanan did not see defendant again until the nighttime.

¶ 31    Buchanan stated that as he and the victim got up to leave Tudy's house, he heard three or four shots. He testified that after hearing the first shot, he looked in that direction and saw sparks from the gun. Buchanan also stated he saw defendant holding the gun.

¶ 32    Buchanan testified that after the first shot fired, Tudy and Tammy entered their house and closed the door behind them, leaving Buchanan and the victim outside. Buchanan and the victim went in separate directions, but both met up on the driveway of another friend's house a few doors

10

down the street. Buchanan testified that as the victim approached, he was holding his side and then collapsed once he reached the driveway.

¶ 33 On cross-examination, Buchanan testified that he was 15 or 20 feet from where defendant shot the gun and that he did not know defendant before that day. In response to counsel's questioning about a pending case against him, Buchanan stated, "I did it already. Got out of jail for it." On redirect, Buchanan testified that his testimony against defendant was not part of a plea deal.

¶ 34 Next, Tudy testified. He knew of defendant because they went to the same school. Tudy testified that on May 1, 2013, he was sitting on his front porch with his mom, sister, and sister's boyfriend. Over the course of the evening and night, defendant walked by his house five to seven times. When defendant would walk by, he stopped periodically as if he was looking for something. Tudy stated the last time that defendant walked by, he stopped and "like tied his shoe, but his shoe was tied." He averred that after defendant left, it was just him and his mom on the front porch, then Buchanan and the victim came. After about five or seven minutes, Tudy heard two gunshots from across the street. He further testified that he did not see anyone on the street, noting that because it was dark, he "could hardly see across the street." Once inside his house, Tudy heard the victim say "ow" and observed him run around the outside of the house. Later, Tudy saw the victim bleeding and unconscious three or four houses down the street. On cross-examination, Tudy denied exchanging words with defendant when he walked by the house. Tudy also denied telling defendant to get off his street.

¶ 35 Tammy Ramlawi testified that she did not personally know defendant, but he looked familiar, and she had heard of him before that night. She stated that she was sitting with her son when Buchanan and the victim came up to their front porch. About five minutes later, defendant

11

walked down the street, stopped, and acted like he was tying his shoe. Defendant would just stare at the front of the house where they were sitting. Tammy testified that he did this two or three times. When defendant got past her house the last time, he took off running up around the corner. Tammy did not see defendant again that night. She testified that she later heard two gunshots. She tried to get the kids in the house, but the victim took off around the side of the house. Tammy did not realize the victim was shot until she saw him lying on the ground of a driveway a few houses down. On cross-examination, Tammy stated that she did not see anyone fire the gun.

¶ 36 Detective Brian Cave next testified. He was responsible for collecting and processing evidence in the case. Detective Cave identified a photograph of a shoeprint that was found in mud near a porch across the street from the Ramlawi house. The photograph was entered into evidence and published to the jury. Detective Cave testified that he took the photograph because it was relayed to him that the suspect had possibly been in that area when the shots were fired. Detective Cave also testified that he did not find any shell casings in the area. However, he did not expect to find shell casings because a revolver was used in the crime and revolvers do not automatically eject shell casings. Detective Cave also identified a black hooded sweatshirt that was located at defendant's residence. He acknowledged that another officer found the hoodie and gave it to him to process.

¶ 37 Arianne Nunley, who was a few blocks away from where the shooting occurred, also testified. On that night, she saw defendant twice. Nunley stated that defendant was wearing black pants and a black hoodie. After hearing gunshots, she saw defendant walking down the street towards his house. She testified that she noticed defendant holding something shiny. Although Nunley acknowledged that she previously told police she thought the object was a gun, the court sustained defense counsel's objection to this testimony.

12

¶ 38　　The dispatcher who received a 9-1-1 call about the incident was also called to testify. The dispatcher testified that she received a call around 9:25 p.m. on May 1, 2013, during which the caller stated that a person had been shot in the abdomen. The audio-recording of the 9-1-1 call was admitted into evidence and played for the jury. Defense counsel did not object. After the 9-1-1 call was played, the dispatcher averred that she was the person who answered the call.

¶ 39　　On the recording, the dispatcher asked who the shooter was and what the shooter was wearing. The caller responded, "We don't know," then proceeded to ask the people in the background if they knew who shot the victim. After a brief moment, the caller stated, "Dude is black 5'7" shorter dreads in a blue hoodie. His name is Laroyce."

¶ 40　　The State's final witness was Gary Brooks, the detective in charge of the investigation. He testified at length about his interviews with defendant. Detective Brooks averred the first interview took place on May 2, 2013, and lasted approximately 45 to 50 minutes, in which defendant did not acknowledge any involvement in the murder. Detective Brooks testified that after he obtained a warrant, he conducted a gunshot residue (GSR) test on defendant's hands. Detective Brooks explained that the time period since the crime, possible transfer of the GSR to a suspect's clothing, and use of hand sanitizer in this case could affect whether gun residue was found. He testified that the test came back negative, but such result did not surprise him.

¶ 41　　Detective Brooks testified that after the first interview, he presented the case to the state's attorney and obtained an information of the charges. Detective Brooks stated, "I went back to the police department and I read it to [defendant] and he told me that he wanted to speak to me again about the case." Detective Brooks and Detective Skalsky conducted the second interview on May 3, 2013. The second interview began at 4:20 p.m. and lasted about an hour and a half. Detective Brooks acknowledged that defendant did not implicate himself for the first hour of the interview.

13

Due to the difficulty in hearing many of defendant's responses, the prosecutor asked Detective Brooks to summarize for the jurors what defendant said during the last half hour of the interview. Detective Brooks also stated that defendant verified that the hoodie recovered from his house was the hoodie defendant wore the night of the shooting.

¶ 42     Detective Brooks also provided testimony regarding the interrogation techniques used during the interview. He conceded that during the interview, he implied that there were 10 people threatening defendant although there was nothing to indicate there were 10 people on the porch. Detective Brooks testified that exaggerating things that he did not necessarily believed happened is a police technique used to minimize the crime and a suspect's involvement to elicit the truth. On cross-examination, Detective Brooks also acknowledged that while he told defendant he reviewed the cameras in the area and that he had the GSR results, both statements were untrue. Edited versions of both interviews were played for the jury.

¶ 43     Detective Brooks testified that after the second interview ended, defendant agreed to show police where he shot and discarded the gun. Defendant was placed in the back of a police car and went to various locations, including the Ramlawi house and an area in East St. Louis where defendant indicated that he discarded the gun. Detective Brooks testified that when they arrived at the Ramlawi house, defendant showed them where he was standing when he fired the shots. Detective Brooks further testified, "As I recall, Detective Cave stated [that] over here on the right-hand side of this residence where [defendant] indicated that he had fired the weapon there was a shoe print that whenever it was—whenever we compared it to [defendant]'s shoes, it appeared to be similar."

¶ 44     Detective Brooks averred that the gun was never recovered after "probably eight officers" searched the area that defendant indicated he disposed the gun for 30 to 40 minutes. He noted that

14

anyone could have come by and picked up the gun on the side of the road or the gun could have been covered by debris.

¶ 45    On cross-examination, defense counsel asked Detective Brooks about the shoeprint. He asked, "You said the crime lab said it was similar, right? Didn't say it was the same shoe, said it was [a] similar shoe?" Detective Brooks replied, "I don't know what the crime lab said. I am just going off what I recall looking at the photograph." In response to further questioning, he acknowledged that it was his personal opinion that the prints looked similar, not that of a forensic scientist. Detective Brooks also conceded that he never showed defendant the hoodie before defendant verified that it was the hoodie he wore on the night of the shooting.

¶ 46    A jury found defendant guilty of first degree murder. The court sentenced defendant to 50 years in prison. Defense counsel filed a motion to reconsider that sentence, arguing it was excessive in light of defendant's youth and other mitigating circumstances. The court denied the motion and this appeal followed. We will discuss additional background information as necessary during our analysis of the issues raised.

¶ 47                                    II. ANALYSIS

¶ 48    On appeal, defendant alleges several contentions of ineffective assistance of counsel. He also contends that his sentence violates the requirements of *Miller v. Alabama*, 567 U.S. 460 (2012), and is excessive under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). For the reasons set forth below, we find that defense counsel provided effective assistance and defendant's sentence is constitutional.

¶ 49                    A. Ineffective Assistance of Counsel Claims

¶ 50    A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel

15

are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). *People v. Albanese*, 104 Ill. 2d 504 (1984) (Illinois Supreme Court adopting the *Strickland* standard). To prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 86. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Defendants must overcome the strong presumption that counsel's conduct falls within the wide range of sound trial strategy. *Id.* The failure to establish either prong of *Strickland* precludes a finding of ineffectiveness. *People v. Easley*, 192 Ill. 2d 307, 318 (2000).

¶ 51                                    i. Failure to File a Motion to Suppress

¶ 52     We first address defendant's claim that counsel was ineffective for failing to file a motion to suppress his confession. The decision to file a motion "is generally a matter of trial strategy, which is entitled to great deference." (Internal quotation marks omitted.) *People v. Gayden*, 2020 IL 123505, ¶ 28. To assert a successful ineffective assistance of counsel claim on the failure to file a suppression motion, defendant must demonstrate (1) the unargued suppression motion was meritorious and (2) a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *People v. Patterson*, 2014 IL 115102, ¶ 81. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 53     Defendant contends a motion to suppress his statement would have been meritorious because the police violated his fifth amendment rights. Defendant further argues that, looking to the totality of the circumstances, his confession was involuntary.

16

¶ 54    Under the fifth amendment of the United States Constitution, which applies to the states through the fourteenth amendment (*People v. Hunt*, 2012 IL 111089, ¶ 23), "[n]o person shall *** be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. The pivotal question in assessing whether defendant's privilege against self-incrimination was violated is whether defendant's statements were made voluntarily. *Miranda*, 384 U.S. at 462 (quoting *Bram v. United States*, 168 U.S. 532, 542 (1897)). Because of the inherent compulsion involved during in-custody police questioning, the fifth amendment privilege against self-incrimination extends to custodial police interrogation. *Id.* at 461-63.

¶ 55    From the outset, we address the State's contention that defendant's first interview was not custodial. To determine whether a defendant is in custody, courts employ an objective standard to analyze whether a reasonable person would have felt he or she was at liberty to leave in light of the totality of the circumstances surrounding the interrogation. *People v. Slater*, 228 Ill. 2d 137, 150 (2008); *J.D.B. v. North Carolina*, 564 U.S. 261, 270-71 (2011). The facts that police interviewed a person at the police station or the interviewed person is whom the police suspect are not dispositive. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Rather, the inquiry is whether "there has been such a restriction on a person's freedom as to render him 'in custody.' " *Id.* The relevant factors in determining whether an interrogation is custodial are: "(1) the location, time, length, mood, and mode of the interrogation, (2) the number of police officers present, (3) the presence or absence of family and friends of the accused, (4) any indicia of formal arrest, and (5) the age, intelligence, and mental makeup of the accused." *People v. Follis*, 2014 IL App (5th) 130288, ¶ 22; *Slater*, 228 Ill. 2d at 150.

¶ 56    Under the totality of the circumstances of this case, a reasonable person would have considered himself to be in custody and not free to leave. We agree with the State that although

17

defendant's PSI revealed defendant had some mental health issues, nothing on the interview recordings showed that the police would have known defendant had learning disabilities and mental health issues. See *Slater*, 228 Ill. 2d at 157-58. However, many of the factors weigh in favor of finding that defendant was in custody for the first interview. Two officers interviewed defendant in a room at the police station. Importantly, although the officers did not formally arrest defendant, they took his shoes before the first interview. The officers were not aggressive but were accusatory. No family or friends of defendant were present. The second interview took place after defendant was formally arrested and booked into jail. Accordingly, we find both interviews were custodial in nature.

¶ 57 To protect a suspect against self-incrimination from "the inherently compelling pressures" of custodial interrogation, the United States Supreme Court adopted prophylactic measures in *Miranda*, 384 U.S. at 467. These procedural safeguards require officers to inform "a suspect before a custodial interrogation that: he has the right to remain silent; anything he says can be used against him in a court of law; he has the right to have an attorney present; and if he cannot afford an attorney, one will be appointed for him before questioning if he so desires." *Hunt*, 2012 IL 111089, ¶ 25 (citing *Miranda*, 384 U.S. at 479). If police fail to provide *Miranda* warnings before a custodial interrogation, the suspect's statements are presumptively involuntary and must be excluded. *People v. Firestine*, 2019 IL App (5th) 180264, ¶ 15. In *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), the Court determined that if police do not scrupulously honor a suspect's invocation of his right to remain silent, any statements obtained as a result must be suppressed. Similarly, in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the United States Supreme Court determined that if a suspect invokes his right to counsel during a custodial interrogation,

18

questioning must cease "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

¶ 58 In this case, there is no question that the interrogating officers provided *Miranda* warnings to defendant before each interrogation. However, defendant argues that he invoked both his right to remain silent and his right to an attorney. Because of the invocation of his rights, defendant contends counsel should have filed a motion to suppress a fraction of his first interview and the entire second interview. The State argues that defendant was not prejudiced by any statements in his first interview and defendant initiated the second interview such that the police did not violate his right to counsel.

¶ 59 To exclude any statements according to *Edwards* or *Mosley*, defendant must actually invoke his rights. *Davis v. United States*, 512 U.S. 452, 458 (1994); see *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). The invocation of either the right to remain silent or right to counsel must be clear and unambiguous. *Berghuis*, 560 U.S. at 381; *Davis*, 512 U.S. at 459.

¶ 60 Here, approximately 40 minutes into the first interview, defendant stated, "I don't wanna talk no more." Such statement clearly and unambiguously invoked his right to remain silent, and the officers' immediate questioning after this statement ignored defendant's invocation of his right. Because the detectives continued to question defendant after he invoked his right to remain silent, the remainder of the interview after this point would have been excluded had defense counsel filed a motion to suppress. Nevertheless, defendant's claim of ineffective assistance of counsel regarding a motion to suppress his first interview does not require reversal because defendant fails to show prejudice. From the time that defendant invoked his right to remain silent and the end of the interview, defendant did not provide any new or additional information than what was provided in his second interrogation, which was admissible for the reasons below. Thus, there is not a

19

reasonable probability that the result of the trial would have been different if the last 10 minutes of defendant's interview had been suppressed.

¶ 61     At the end of the first interview, defendant stated, "Can I wait for my lawyer to do this? Can I get a lawyer?" which clearly invoked his right to counsel. Thereafter the detectives stopped questioning defendant. Defendant contends that because he invoked his right to counsel in his first interview, police violated his rights in conducting a second interview outside the presence of counsel.

¶ 62     Once a person invokes his right to counsel, police cannot further question him without the presence of the counsel unless the accused initiates further discussion. *People v. Branch*, 2017 IL App (5th) 130220, ¶ 23. Inquiries or statements "relating to routine incidents of the custodial relationship" are insufficient to initiate further discussion. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983). Rather, the accused must "evince[ ] a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045-46. However, even where an accused initiates a generalized discussion about the investigation, his waiver of the right to counsel must be voluntary. *Id.* at 1046.

¶ 63     The only evidence that defendant initiated a conversation was Detective Brooks's testimony that defendant asked to speak to him after reading defendant the warrant and the detective indicating as such in the video of the second interrogation. The record is void of any evidence concerning the details of their conversation—including exactly what defendant said—or circumstances that occurred before defendant's second interrogation began. Detective Brooks's testimony, and his statements in the video of the second interrogation, fails to elucidate whether defendant truly indicated that he wanted to enter a generalized discussion related to the investigation before the second interrogation began.

20

¶ 64 Due to the scant record, we cannot say whether counsel erred in failing to require the State prove defendant reopened the dialogue. Because the determination of whether defendant's waiver of his right to counsel was voluntary depends on the totality of the circumstances—including the time before defendant's second interrogation and "the necessary fact that the accused, not the police, reopened the dialogue with the authorities" (internal quotation marks omitted) (*id.*)—we also cannot say whether a motion to suppress on this basis would have been successful. As such, these contentions are better suited for a collateral attack where the record can be better developed. *People v. Veach*, 2017 IL 120649, ¶ 46 ("ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim").

¶ 65 We nevertheless must consider whether defendant's statements were overall voluntary. *Slater*, 228 Ill. 2d at 159-60. The inquiry into whether a confession was voluntary is whether an individual made a confession "without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." (Internal quotation marks omitted.) *People v. Murdock*, 2012 IL 112362, ¶ 30. To make this determination, a reviewing court considers the totality of the circumstances, including "age, intelligence, background, experience, mental capacity, education, \*\*\* physical condition at the time of questioning[,] \*\*\* the legality and duration of the detention; the duration of the questioning; the provision of *Miranda* warnings; and \*\*\* [t]he presence of any physical or mental abuse by police, including threats or promises, as well as the use of trickery, deception, or subterfuge." *In re D.L.H.*, 2015 IL 117341, ¶ 59. No single factor is dispositive. *In re G.O.*, 191 Ill. 2d 37, 54 (2000).

¶ 66 Illinois court have also recognized that juvenile confessions present "a sensitive concern." *People v. Prude*, 66 Ill. 2d 470, 476 (1977). As such, reviewing courts must take the greatest care

21

to assure that a juvenile's confession was not coerced, suggested, or "the product of adolescent fantasy, fright, or despair." *Murdock*, 2012 IL 112362, ¶ 32. For this reason, the additional "concerned adult" factor is recognized to be a relevant consideration. *In re G.O.*, 191 Ill. 2d at 55. The concerned adult factor considers "whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare[,] *** the police prevented the juvenile from conferring with a concerned adult[,] and *** the police frustrated the parents' attempt to confer with the juvenile." *Id*. In its brief, the State argues that because—at the time of defendant's interrogation—the Juvenile Court Act of 1987 (Act) applied to only those under 17 years old and defendant was 17 years old, he should not be considered a juvenile. It further contends that due to the inapplicability of the Act, the officers were not obligated to allow defendant to consult with a concerned adult under section 5-405(2) of the Act (705 ILCS 405/5-405(2) (West 2012)), and this court should not consider that factor.

¶ 67    To be afforded the protections of the Act is a matter of legislative grace, as "[j]uveniles have neither a common law nor a constitutional right to adjudication under the [Act]." *In re M.I.*, 2013 IL 113776, ¶ 46. The Act is a statutory creation whose application is solely determined by the legislature. *Id.* Accordingly, section 5-120 of the Act, which limits the availability of proceedings under the Act to "any minor who prior to the minor's 17th birthday" violated a law (705 ILCS 405/5-120 (West 2012)), is merely a legislative parameter of the Act's applicability. See *People v. P.H.*, 145 Ill. 2d 209, 223 (1991). This section therefore only determines who is considered a delinquent minor under the Act, not who is a juvenile. See *People v. Macias*, 2015 IL App (1st) 132039, ¶ 54. For constitutional purposes, juveniles are individuals under the age of 18. *People v. Harris*, 2018 IL 121932, ¶ 56; *Roper v. Simmons*, 543 U.S. 551, 574 (2005); *Graham v. Florida*, 560 U.S. 48, 74-75 (2010); *Miller v. Alabama*, 567 U.S. 460, 465 (2012).

22

¶ 68    Moreover, in addition to what is required by state statutory law, we look to the totality of the circumstances in determining whether a statement is voluntary. As such, whether defendant was allowed to speak with a parent or concerned adult is nevertheless a relevant factor. *In re G.O.*, 191 Ill. 2d at 55; *People v. Westmorland*, 372 Ill. App. 3d 868, 880-84 (2007); *Gallegos v. Colorado*, 370 U.S. 49, 55 (1962); *Murdock v. Dorethy*, 846 F.3d 203, 209 (7th Cir. 2017); *Doody v. Schriro*, 548 F.3d 847, 867 (9th Cir. 2008); *United States ex rel. Burgos v. Follette*, 448 F.2d 130, 132 (2d Cir. 1971); *Williams v. Peyton*, 404 F.2d 528, 531 (4th Cir. 1968); *Mitchell v. Stephens*, 353 F.2d 129, 137 (8th Cir. 1965) (defendant was 23 years old).

¶ 69    A juvenile's statements, however, should not be suppressed merely because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation. *Murdock*, 2012 IL 112362, ¶ 33. The absence of a concerned adult "is not enough to suppress the confession if other factors indicate that the confession was voluntary." *Hardaway v. Young*, 302 F.3d 757, 765 (7th Cir. 2002). The concerned adult factor is not dispositive but rather "is just one of the many factors for the court to consider." *Murdock*, 2012 IL 112362, ¶ 33.

¶ 70    It is clear that defendant was denied access to his mother despite his repeated requests to talk with her. However, the police clarified that access to his mother was not conditioned on defendant's cooperation. The video of the second interview reveals that the detectives, at some point, spoke with defendant's mother and attempted to contact his mother upon his request during the second interrogation. Yet, one detective explicitly stated that he could not make a promise to defendant that he could see his mother. The officer further explained that he could not say defendant would be allowed to speak to his mother if defendant told the truth. The detective clarified that defendant must want to cooperate on his own accord. Therefore, while we do not condone the police disallowing defendant to confer with his mother, here, it was not a coercive

23

tactic. As noted above, the absence of a concerned adult is not—by itself—dispositive; we must look to the totality of the circumstances.

¶ 71    There is no evidence of physical coercion or other abuse by the police, which weighs in favor of finding defendant's statements voluntary. Defendant contends the detectives engaged in deceit and trickery by lying about the evidence against him. Specifically, defendant asserts the police lied about the number of witnesses, the location of cameras, and that they viewed the cameras. The record belies defendant's assertion that the police lied about the location of the cameras, as Detective Brooks testified there was one camera at the library in the area.

¶ 72    Nevertheless, Detective Brooks admitted to lying about the number of people on the porch at the time of the shooting and that he had not reviewed the footage from the cameras in the area before defendant's interviews. While deception contributes to the coerciveness of the interrogation, it is not *per se* unlawful. *Patterson*, 2014 IL 115102, ¶ 76. In the second interrogation, Detective Skalsky explained that he would not tell defendant everything he knew or how he knew certain facts. The detective's statement regarding the cameras did not indicate that the footage was inconsistent with defendant's story or that defendant was lying. Moreover, even after the detectives mentioned their review of the video cameras, defendant denied involvement and made subsequent requests for them to review the cameras to verify his story. Similarly, after the detective implied that there were 10 people on the porch at the time of the shooting, defendant stuck to his original narrative that he was not involved in the shooting. Indeed, defendant was the first to indicate that there were more than four people on the porch. As such, while we do not approve of the police's tactics, there is no indication that the detective's actions caused defendant to make any inculpatory statement or overbore defendant's will. See *People v. Johnson*, 368 Ill. App. 3d 1073, 1089 (2006).

24

¶ 73    Also weighing in favor of voluntariness, defendant's interrogations were conducted at reasonable times and not for an extended amount of time. Defendant was provided a bottle of water before his first interrogation. While defendant was detained for four hours after his first interrogation and before being formally arrested, the interrogation lasted only about 50 minutes and occurred midday. Defendant was also provided food and a blanket once the interrogation ended. Before his second interrogation, defendant was provided a drink, food, and a blanket. The second interrogation began at 4:20 p.m. and lasted roughly an hour and a half. The police also provided *Miranda* warnings before each encounter. As such, the length and conditions of the interrogation did not contribute to a coercive atmosphere that would render defendant's statements as involuntary. See *Murdock*, 2012 IL 112362, ¶¶ 46-47 (the facts of police offering food and drink, a total interrogation time of three hours, and the interrogation occurring in the evening, all favor a finding of voluntariness); see also *People v. Morgan*, 197 Ill. 2d 404, 441 (2001) (citing the fact that defendant was informed on his *Miranda* rights in determining that the juvenile defendant's confession was voluntary).

¶ 74    Looking at defendant's specific characteristics, he was reserved and anxious at times throughout the interrogations. Some nervousness, however, is not inconsistent with voluntariness. See *Murdock*, 2012 IL 112362, ¶ 46. At 17 years old, he was on the older end of the juvenile scale. While defendant's presentence investigation report notes his learning difficulties and mental health issues, defendant had completed the tenth grade. See *Macias*, 2015 IL App (1st) 132039, ¶ 58 ("[S]tatements made by defendants with a ninth-grade education, or less, have been found voluntary in Illinois." (Internal quotation marks omitted.)). Defendant has also had several prior encounters with the criminal justice system, including a felony charge of residential burglary, a felony charge of possession of a stolen vehicle, two counts of aggravated assault of a police officer,

25

and two counts of resisting a peace officer. See *Hardaway*, 302 F.3d at 767 ("As the state courts recognized, past brushes with the law weigh against the normal presumption that youths are specially sensitive to coercion.").

¶ 75    Moreover, the video showed no communication issues. Defendant informed the officers that he could read and write. The officers ensured this by asking defendant to read one of his *Miranda* rights before the officer read the remaining rights. Defendant indicated that he understood his *Miranda* rights and further demonstrated his knowledge of such rights by invoking both the right to remain silent and the right to an attorney. *In re G.O.*, 191 Ill. 2d at 56-57 (in finding that a juvenile defendant's confession was voluntary absent a concerned adult, the Illinois Supreme Court noted that the evidence demonstrated that defendant understood his *Miranda* rights). After exercising these rights, the police again provided *Miranda* warnings before the second interrogation, which reiterated that defendant was entitled to have an attorney present and the right to remain silent. The video also demonstrated that defendant was able to understand the officers' questions and provide clear, responsive answers. See *Slater*, 228 Ill. 2d at 160.

¶ 76    Accordingly, while the absence of a concerned adult weighs against voluntariness, the other factors weigh in favor of finding defendant's statements were voluntary. In light of the totality of the circumstances, we find that neither the police's actions, nor the interrogation atmosphere, caused defendant's will to be overcome. Defendant's statements from his second interrogation were therefore voluntary, and not the product of coercion. Consequently, defendant cannot show the necessary prejudice for his ineffective assistance of counsel claim based on the voluntariness of his confession.

26

¶ 77                              ii. Cumulative Error

¶ 78    Defendant further argues that counsel committed several other errors involving the failure to present and to object several items of evidence. Defendant contends these errors, cumulatively, prejudiced him and denied him of a fair trial. Before considering any resulting prejudice from counsel's actions, we first determine whether counsel erred.

¶ 79                          a. Failure to Present Evidence

¶ 80    Defendant claims counsel was ineffective for failing to present impeachment evidence and an argument concerning the GSR evidence. Specifically, defendant alleges counsel was ineffective in failing to present (1) favorable treatment in another criminal case to impeach Tammy, (2) favorable treatment in another criminal case to impeach Nunley, (3) the extent of favorable treatment to Buchanan for his testimony, (4) inconsistencies between Detective Brooks's grand jury testimony and testimony at trial, and (5) an explicit challenge to the State's explanation of the negative GSR test result.

¶ 81    The decisions to present evidence, including impeachment evidence, have long been recognized as matters of trial strategy. *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997); *People v. West*, 187 Ill. 2d 418, 432 (1999). Such matters are generally insufficient to support a claim of ineffective assistance of counsel, unless defendant can show that counsel's actions were objectively unreasonable. *People v. Peterson*, 2017 IL 120331, ¶ 80; *Pecoraro*, 175 Ill. 2d at 326-27; *People v. Leeper*, 317 Ill. App. 3d 475, 483 (2000). Defendant is entitled to only " 'competent, not perfect representation.' " *West*, 187 Ill. 2d at 432 (quoting *People v. Stewart*, 104 Ill. 2d 463, 492 (1984)).

27

¶ 82    Defendant's claims regarding the impeachment of Tammy and Nunley rely on facts outside of the record. Accordingly, such claims are better suited for a collateral attack. *Veach*, 2017 IL 120649, ¶ 46.

¶ 83    In support of his claim that counsel failed to properly impeach Buchanan by explaining the extent of the favorable treatment afforded to Buchanan, defendant again relies on information outside the record. Nonetheless, defendant concedes that counsel did impeach Buchanan by raising the possibility that Buchanan received favorable treatment for his testimony at trial. Any further questioning on the subject would have been cumulative and was therefore a matter of trial strategy. *People v. Phillips*, 2017 IL App (4th) 160557, ¶¶ 58-59.

¶ 84    Defendant's arguments concerning inconsistencies between Detective Brooks's grand jury testimony and the testimony at trial must also fail. He first contends that Detective Brooks testified at the grand jury that shell casings were found, but, at trial, Detective Cave testified that no shell casing were found. Defendant further noted evidence was presented that a .22 caliber gun was the murder weapon which would not have ejected casings. However, defendant fails to assert how counsel could have raised this inconsistency. At trial, Detective Brooks did not testify to the evidence found at the crime scene. While Detective Cave testified no shell casings were recovered, counsel could not have used Detective Brooks's grand jury testimony to impeach Detective Cave. Even if counsel could raise such issue, such evidence would—at most—indicate Detective Brooks was mistaken, as he indicated a .22 caliber gun was likely the murder weapon to the grand jury and was not the officer to analyze the crime scene. As such, we do not find counsel erred in this respect.

¶ 85    Likewise, we see no error in counsel's failure to raise Detective Brooks's grand jury testimony that no eyewitness identified defendant shooting the gun. At trial, Buchanan testified

28

that when he looked in the direction of where the gunshots were coming from, he saw gun sparks and defendant holding the gun. Defendant, however, concedes it is unclear when Detective Brooks knew Buchanan identified defendant as the shooter. Further, defendant, once again, fails to explain how counsel should have impeached Buchanan with Detective Brooks's prior statement. Counsel also could not have impeached Detective Brooks with his prior grand jury testimony because, at trial, he did not testify to what Buchanan told police. Accordingly, we do not find counsel's actions were objectively unreasonable.

¶ 86 With respect to his claim concerning the GSR testing, defendant argues that because Detective Brooks testified the negative GSR testing on defendant's hands were not exonerating due to the GSR's ability to attach to the person's clothing worn at the time of the shooting, counsel should have informed or argued that the State collected defendant's clothing and hoodie but failed to present any GSR testing results for those items. Based on the record, we find counsel did highlight the fact that there was no GSR testing connecting defendant's hoodie to the crime. While Detective Brooks testified that defendant indicated the hoodie found at defendant's house was the hoodie he wore on the night in question, Detective Brooks admitted on cross-examination that he never showed defendant the hoodie that was taken from his home to verify that it was in fact the hoodie he wore on the night of the shooting. In closing, counsel argued "[t]here's no gunpowder residue." Counsel then explained that although the hoodie admitted into evidence was discovered at defendant's house, there was no evidence connecting the hoodie to the crime. Counsel's argument that no evidence connected the hoodie to what defendant wore the night of the crime would include the lack of scientific evidence. Thus, we find counsel did not err.

29

¶ 87                                    b. Failure to Object

¶ 88    Defendant next argues that counsel was ineffective for failing to object to (1) the admission of the 9-1-1 call, (2) Detective Brooks's testimony regarding shoeprint evidence, and (3) several prosecutorial comments. Ordinarily, decisions regarding what to object to and when to object are matters of trial strategy. *Pecoraro*, 175 Ill. 2d at 327. We therefore give much deference to counsel on such decisions, and only find error if counsel's actions were objectively unreasonable. *Id.*; *People v. Perry*, 224 Ill. 2d 312, 344 (2007). We address each of defendant's claim of ineffective assistance of counsel based on counsel's failure to object in turn.

¶ 89                                    1. 9-1-1 Call

¶ 90    We first address counsel's failure to object to the admission of the 9-1-1 call. While 9-1-1 calls may fall into the hearsay exception for excited utterances (see *People v. Morales*, 2021 IL App (2d) 190408, ¶¶ 11-18), an otherwise admissible telephone conversation may be admitted only upon a proper foundation that assures "the recording's reliability and authenticity, including the identification of voices." *People v. Camacho*, 2018 IL App (2d) 160350, ¶ 23. A proper foundation for a telephone conversation requires a witness familiar with the speaker such that the witness could identify the speaker's voice or other corroborative evidence from which the speaker can be identified. *People v. Caffey*, 205 Ill. 2d 52, 94-95 (2001).

¶ 91    The record here shows that the 9-1-1 dispatcher only identified her own voice but did not identify the caller nor testify that she recognized the caller's voice. There was no other evidence to corroborate who called 9-1-1. Moreover, the recording demonstrated that the caller did not know the identity of the shooter until the caller asked an undisclosed person. There is no indication as to how either person had a basis for knowing defendant was the shooter. Because the State failed to

30

lay a proper foundation, the 9-1-1 call should not have been admitted and counsel was unreasonable in failing to object.[1]

¶ 92                                    2. Shoeprint Evidence

¶ 93    Defendant also contends that counsel was ineffective for failing to object to the testimony of Detective Brooks regarding shoeprint evidence. He argues that not only was Detective Brooks not an expert in forensic science or shoeprint analysis, the shoeprint evidence lacked a proper foundation and was far more prejudicial than probative.

¶ 94    The Illinois Supreme Court discussed the admissibility of shoeprint evidence for identification purposes in *People v. Campbell*, 146 Ill. 2d 363 (1992). It determined that shoeprint evidence may be reliable and trustworthy if significant general and individual characteristics are present. *Id.* at 376, 378-79. Absent sufficient unique, distinctive characteristics, however, may result in general problems with the probative value of the shoeprint evidence. *Id.* at 378. General characteristics, alone, are rarely sufficient. *Id.* The court clarified "that in shoeprint comparison, the first step in the analysis is to note any fundamental differences between the shoe and the shoeprint. A fundamental difference is one such as size, shape, or make, that precludes any further comparison. Absent fundamental differences, points of similarity are located and recorded." *Id.* at 382-83. In *Campbell*, because a forensic expert testified that the shoeprint at the crime scene matched defendant's shoe based on not only the general pattern and size of the shoe but also six peculiar signs of wear, the court found the evidence was sufficiently reliable.

¶ 95    Unlike *Campbell*, Detective Brooks was not an expert in shoeprint analysis—or any forensic science. Moreover, Detective Brooks testified that the shoeprint looks similar to

---

[1]In its brief, the State does not argue to the contrary; instead, it argues that defendant was not prejudiced.

defendant's shoes but failed to disclose the similarities on which he based his opinion. The record lacks both unique characteristics and general characteristics. Thus, such evidence is unreliable identification evidence that would have been excluded had counsel objected.

¶ 96                                    3. Prosecutor's Comments

¶ 97    Lastly, defendant alleges several errors of ineffectiveness regarding the State's statements and one of the State's questions. We first address defendant's contention that counsel was ineffective for failing to strike an answer to the State's question that improperly impeached its own witness Nunley.

¶ 98    After Nunley testified that defendant had something shiny, but she did not know what it was, the prosecutor asked if she remembered telling the police that the shiny object was a gun. Nunley answered in the affirmative. After the court sustained counsel's objection to the question and answer, the State again asked if Nunley thought it was a gun and she stated "yes." Counsel again objected and the court sustained the objection. While counsel did not request the answer be stricken, counsel promptly objected to both questions and the court sustained both objections. Also, the court later instructed the jury that it should disregard questions to which objections were sustained. We therefore find no error. See *People v. Outlaw*, 388 Ill. App. 3d 1072, 1088 (2009).

¶ 99    Defendant also argues that counsel was ineffective for failing to object to improper remarks during the State's closing and opening arguments.[2] Prosecutors are afforded wide latitude in closing arguments. *People v. Jackson*, 2020 IL 124112, ¶ 82. This latitude, however, is not

---

[2]Defendant also contends that counsel erred in failing to object to the State's opening remarks concerning the 9-1-1 call. Because we found the 9-1-1 call was improperly admitted, we need not analyze this issue. Nevertheless, we note that defendant mischaracterizes the State's opening statement to contend that the 9-1-1 caller immediately identified defendant as the shooter. Rather, the State remarked that "[p]eople knew who the shooter was right away." Then, it stated that defendant was identified as the shooter on the 9-1-1 call and by the witnesses at the scene when the shots were fired. In context, we do not find the State indicated that the 9-1-1 caller immediately identified defendant as the shooter.

unlimited. *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 49. Prosecutors may not misstate the evidence, draw unreasonable inferences from the evidence, or misstate the law. *Id.* When determining whether the remarks are proper, reviewing courts do not consider the selected passage in isolation, but in the context of the closing argument as a whole. *Jackson*, 2020 IL 124112, ¶ 82. Reversal is warranted only if the remarks result in subjectional prejudice or it is impossible to know whether the improper comments contributed to defendant's conviction. *Id.* ¶ 83.

¶ 100 Defendant first challenged the State's comments regarding the victim's personal characteristics, hobbies, family relationships, and the senseless nature of the crime. For example, the prosecution stated that the case presented "the senseless, tragic violent death of [the victim]," that this was "the murder of a truly innocent child," and that the victim's "mother found him barely fighting for life." We find that many of these statements were proper commentary on the evils of the crime, and the remaining statements regarding the victim's background were not prejudicial enough to warrant reversal. Counsel therefore did not provide ineffective assistance of counsel on this basis.

¶ 101 Defendant also contends counsel should have objected to the prosecutor's indication that all the witnesses would identify or had identified defendant as the shooter. In opening, the prosecutor stated that a number of witnesses "identify defendant as the person who fired the fatal shots at [the victim]." In closing, the prosecutor stated, "We know that Defendant personally discharged the firearm because all of the witnesses told us that he did." The prosecutor then explained that two witnesses testified that defendant was walking back and forth toward the home immediately before the shots were fired, and that Buchanan identified defendant as the shooter. While the prosecutor initially stated that all the witnesses testified that defendant was the shooter, we do not believe the State's comments misstated the evidence in context of the whole closing

argument where it further explained the actual testimony of the witnesses. Accordingly, counsel was not objectively unreasonable in failing to object to these statements.

¶ 102   Defendant next argues that the prosecutor misstated the evidence when she indicated that defendant told police that he did not shoot the gun into the air. In the second interview, defendant demonstrated the way he held the gun when he fired it. Initially, he informed officers that he put the gun in the air, but when Detective Brooks attempted to verify defendant's story, defendant repositioned his arm closer to a straight line. Moreover, the precise angle of defendant's arm is of no consequence, where the State's argument was that firing a gun in the general direction of the porch created a risk of death or great bodily harm regardless of defendant's intent. We therefore do not find this statement to be improper.

¶ 103   We do, however, agree with defendant's last contention that the State misstated the law in closing arguments. In its rebuttal, the State argued, "Defendant is presumed innocent until you guys go back to deliberations. At that point that presumption of innocence ends." This statement is incorrect. Defendant is presumed innocent until the jury concludes, during deliberation, that there existed proof of guilt beyond a reasonable doubt. *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004) (citing *People v. Viser*, 62 Ill. 2d 568, 585-86 (1975)). Because the State improperly misstated the law (*Holmon*, 2019 IL App (5th) 160207, ¶ 5), counsel should have objected.

¶ 104                              c. Cumulative Effect

¶ 105   As noted above, defendant does not contend any individual error warrants a new trial. Instead, he contends that the cumulative effect of the errors prejudiced him and denied him of a fair trial. We disagree.

¶ 106   Where counsel's errors are not sufficiently grave to entitle defendant to a new trial, a new trial may be granted on cumulative error where the errors "create a pervasive pattern of unfair

34

prejudice to defendant's case." *People v. Young*, 347 Ill. App. 3d 909, 923 (2004); *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005); *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 110; *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55. Cumulative error analysis depends on the evaluation of counsel's individual errors. *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002). " 'There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue.' " *Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 110 (quoting *People v. Green*, 2017 IL App (1st) 152513, ¶ 118); *Sims*, 2019 IL App (3d) 170417, ¶ 55 (same).

¶ 107   We note that many of the claims of ineffective assistance of counsel have been rejected. As such, we only consider defendant's claims in which this court found merit. See *Perry*, 224 Ill. 2d at 356.[3]

¶ 108   While counsel erred in failing to object to two improperly admitted pieces of evidence and the prosecution's misstatement of law, this case was supported with defendant's own inculpatory statements. Defendant admitted to shooting the gun that killed the victim. Moreover, he led the detectives to the location where he discharged the gun, which was where the shoeprint was found. His statements were also corroborated by a few eyewitnesses, one of which observed defendant shooting the gun. While the State also misstated the law regarding the presumption of innocence, the comment was isolated, and the court instructed the jurors that presumption of innocence remains with defendant during their deliberations on the verdict and is not overcome unless they

---

[3]In addition to the above allegations of ineffective assistance of counsel, defendant also contends this court should consider the State's improper bolstering of its witness, Tammy, in our cumulative error analysis. We decline to do so.

Without imparting any blame of counsel, defendant also contends that the State improperly elicited Tammy's prior consistent statements. Other than to rebut charges of fabrication, admission of prior consistent statements is error, but "it does not necessarily constitute reversible error." *People v. Williams*, 264 Ill. App. 3d 278, 288 (1993). At trial, after Tammy testified that she saw defendant in the area of the crime that night, the State asked, "did you tell [police] that you had seen [defendant] that night?" Tammy answered "yes." The State therefore improperly elicited prior consistent statements of its witness. However, because Tammy's answer provided mere acknowledgement of having made a prior consistent statement and the testimony of the witness was corroborated by other evidence, we cannot say that such error prejudiced defendant. See *id*.

are convinced beyond a reasonable doubt that he is guilty. See *Holmon*, 2019 IL App (5th) 160207, ¶ 55. Accordingly, even considering the errors of counsel, we do not find they created a pervasive pattern of unfair prejudice.

¶ 109                                    B. Sentencing Error

¶ 110   In imposing his 50-year sentence, defendant argues the court failed to comply with the mandates of *Miller v. Alabama*, 567 U.S. 460, 480 (2012), and that his sentence is excessive where the State failed to prove that defendant intended to kill anyone. Defendant contends while the court mentioned the *Miller* factors generally, it failed to make a finding—and the record does not show that—defendant was incorrigible or beyond redemption. He further asserts the mere mention of the factors does not dispose of the requirement that the court "meaningfully consider defendant's youth and attendant characteristics." *People v. Morris*, 2017 IL App (1st) 141117, ¶¶ 30, 32. We disagree.

¶ 111   The United States Supreme Court has made it clear that a court need not make particular findings on the record before sentencing a juvenile to life imprisonment as long as it considered youth and its attendant circumstances. In *Miller*, the Supreme Court held that the Constitution requires sentencing courts to consider youth and its attendant circumstances before imposing a sentence of life without parole for juveniles. 567 U.S. at 480. The Court later clarified that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility." *Montgomery v. Louisiana*, 577 U.S. 190, 211 (2016). Most recently, after oral arguments in this case were held, the Supreme Court published *Jones v. Mississippi*, 593 U.S. __, __, 141 S. Ct. 1307, 1316 (2021), which reiterates that the Constitution does not require particular findings regarding the *Miller* factors or incorrigibility before imposing a life sentence for juveniles. *Miller* only requires a discretionary sentencing procedure. *Id.* at __, 141 S. Ct. at 1317. This is so because

36

a discretionary sentencing procedure ensures the sentencing court will consider the characteristics of youth and that sentences of life without parole are imposed where "appropriate in light of the defendant's age." *Id.* at __, 141 S. Ct. at 1318. The Court also rejected the contention that a sentencing court must provide an explanation. *Id.* at __, 141 S. Ct. at 1319. It reasoned where a discretionary sentencing scheme allows a court to consider youth and its attendant circumstances, the sentencing court will consider such factors. *Id.*

¶ 112   The sentencing court here imposed a discretionary 50-year sentence after being apprised of defendant's youth. In arguing for the minimum sentence, defense counsel specifically referred defendant's age, mental health issues, family life, and maturity. The court also stated that it considered the factors relevant in sentencing a juvenile and noted defendant's "tough life." As such, its imposition of 50 years' imprisonment complies with *Miller* and its progeny.

¶ 113   Defendant further argues that his 50-year sentence is excessive where the State failed to prove that defendant intended to kill anyone and in light of defendant's mental health issues. The trial court is afforded great discretion when imposing a sentence, because—unlike a reviewing court—it has an opportunity to weigh such factors as "defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26. Consequently, a reviewing court may not overturn a sentencing decision because it might have weighed the factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A sentencing decision will be overturned only where a trial court abuses its discretion. *Id.* at 209-10. "When a sentence imposed falls within the statutorily prescribed range, it will not be found to be excessive or an abuse of discretion unless the sentence greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Etherton*, 2017 IL App (5th) 140427, ¶ 28. The trial court's sentence must balance defendant's rehabilitative potential

37

with the seriousness of the offense. *Id.* "However, the court is not required to give more weight to the defendant's potential for rehabilitation than it gives to aggravating factors." *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32.

¶ 114   While defendant contends a 50-year sentence is excessive where the State did not prove that he intended to kill someone, he fails to cite to any authority for this proposition. Based on the record, it is clear the court considered both factors in mitigation and aggravation before fashioning its sentence that fell within the statutorily prescribed range. The court did not depend on any allegation that defendant intended to kill someone in imposing 50 years' imprisonment. Rather, it noted defendant's prior criminal history, the nature of the crime, and the necessity to deter others. Although the maliciousness demonstrated by one's intent to kill requires deterrence, so does the senseless violent action of firing at a group of people over verbal threats or mockery. Based on this record, we cannot find the court abused its discretion in deciding to sentence defendant to 50 years' imprisonment, 10 years less than the maximum.

¶ 115                                III. CONCLUSION

¶ 116   For the reasons above, we find that defendant failed to establish that his trial counsel provided ineffective assistance of counsel. We also find that the trial court complied with *Miller* in sentencing defendant to 50 years' imprisonment and that such sentence is not excessive. We therefore affirm defendant's conviction and sentence.

¶ 117   Affirmed.

¶ 118   JUSTICE WHARTON, dissenting:

¶ 119   Although I agree with much of the majority's reasoning, I cannot join them in rejecting the defendant's claim of ineffective assistance of counsel. I disagree with the majority on two key points related to defense counsel's failure to file a motion to suppress. First, I believe the record is

38

adequate for this court to determine that the defendant was prejudiced by counsel's failure to require the State to prove that the defendant voluntarily waived his right to counsel after previously invoking that right. Second, I believe the defendant's ultimate confession was not voluntary. For these reasons, I respectfully dissent.

¶ 120   The right and access to counsel stands as the single most important protection individuals have against State intrusion on their liberty. This protection is of the utmost importance during custodial interrogation by police. For this reason, the United States Supreme Court has held that police must scrupulously honor a defendant's request for counsel. *Mosley*, 423 U.S. at 104. Here, that did not occur. Instead, the police responded to the juvenile defendant's invocation of his right to counsel by holding him alone in an interrogation room for 4 hours—a form of temporary solitary confinement—and keeping him in custody for 24 hours without allowing him access to his mother, who could have provided this young defendant with both emotional support and assistance in retaining counsel. It is against this backdrop that we must assess whether the defendant actually reopened a dialog with police and, if so, whether he did so voluntarily.

¶ 121   As the majority correctly points out, the only evidence suggesting that the defendant reopened a dialog with police after clearly and unequivocally invoking his right to counsel was Detective Brooks's testimony that after he showed the defendant the arrest warrant, the defendant told him "that he wanted to speak with [him] again about the case." Notably absent from this testimony was any indication of what the defendant said to Detective Brooks or any other details of their conversation. Thus, the State did not present evidence demonstrating that the defendant communicated "a desire for a generalized discussion about the investigation" (*Bradshaw*, 462 U.S. at 1045-46). It was the State that bore the burden of proof on this question. See *id.* at 1044. I can

39

think of no sound strategic reason for counsel to fail to hold the State to its burden by filing a motion to suppress.

¶ 122   The majority finds that because the record does not clearly indicate whether the defendant ever stated that he wanted to enter into a general discussion of the crime, his claim is better suited to a collateral proceeding in which the record can be more fully developed. I disagree for two reasons. First, any incompleteness in the record is the direct result of counsel's failure to file a motion to suppress. The effect of the majority's holding is to presume that the defendant did reopen the dialog unless he can prove otherwise in a collateral proceeding. This shifts the burden from the State to the defendant. Moreover, while the Post-Conviction Hearing Act provides an avenue of relief for defendants whose claims of constitutional error could not have been raised on direct appeal, it imposes procedural hurdles that can be difficult for *pro se* prisoners to overcome. See *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996) (explaining that in order to advance to the second stage of postconviction proceedings, a *pro se* petitioner must assert the gist of a constitutional claim); 725 ILCS 5/122-1(c) (West 2016) (providing that a petitioner must file his petition within the time limits imposed under the Post-Conviction Hearing Act unless he alleges facts demonstrating that his delay was not due to his own culpable negligence). Even if petitioners get past these procedural hurdles, they are entitled only to the reasonable assistance of counsel, a standard that is "significantly lower than the one mandated at trial." *People v. Custer*, 2019 IL 123339, ¶ 30. Claims of ineffective assistance of counsel should thus be considered on direct appeal unless the record is truly inadequate to resolve them. See *Veach*, 2017 IL 120649, ¶ 46; *People v. Ramirez*, 2017 IL App (1st) 130022-B, ¶ 14.

¶ 123   Second, even assuming the defendant clearly indicated that he wanted to engage in a general discussion of the crime, I believe the record contains sufficient evidence concerning the

circumstances surrounding his decision to do so to allow this court to conclude that his waiver was not voluntary. As the majority discussed in detail, the defendant asked to speak to his mother multiple times during his first interview. Significantly, he stated that he wanted his mother to contact an attorney on his behalf. However, the detectives did not allow the defendant to contact his mother, and Detective Brooks told the defendant that she would not be allowed to see him. I note that when a suspect in custody has retained counsel, police may not deny the attorney access to his client or refuse to inform a suspect that his attorney has attempted to contact him. *People v. McCauley*, 163 Ill. 2d 414, 444-45 (1994). Under the circumstances of this case—where police knew that the juvenile defendant wanted his mother to find him an attorney—denying the defendant and his mother access to each other was equally egregious. In addition, the defendant was held in an interview room for over 4½ hours, nearly 4 hours of which came on the heels of his invocation of the right to counsel, and he was then formally arrested. By the next afternoon—when the defendant allegedly told Detective Brooks that he wanted to discuss the case again—the defendant had not been permitted to speak to his mother and had not been provided with an attorney. These circumstances may well have led the defendant to believe that it would have been pointless for him to insist on waiting for an attorney, a belief that was reasonable under the circumstances.

¶ 124　It is also important to consider the characteristics and conduct of the defendant. See *Bradshaw*, 462 U.S. at 1046. The defendant was only 17 years old, and he had multiple mental health and developmental diagnoses, including a learning disability, attention deficit/hyperactivity disorder, depression, and anxiety. These characteristics made him particularly susceptible to the circumstances I have just described. I recognize that the defendant's prior experience with the criminal justice system is a factor that can weigh in favor of a finding that his waiver was knowing

41

and voluntary. See *People v. Jones*, 2014 IL App (1st) 120927, ¶ 51. However, no one factor is dispositive. See *People v. Braggs*, 209 Ill. 2d 492, 514 (2003). Considering the totality of the circumstances, I believe it is reasonably probable that had counsel filed a motion to suppress the defendant's statement on the basis of the detectives' failure to scrupulously honor his request for counsel, such a motion would have been granted.

¶ 125   I also do not agree with the majority's conclusion that the confession ultimately obtained was voluntary. The defendant was only 17 years old when he made the statements at issue, and he suffered from depression and anxiety. Although there is no evidence in the record concerning the defendant's physical condition during either interrogation, it is clear that, emotionally, he was extremely uncomfortable during both interrogations. Throughout both interviews, the defendant gave many answers that were barely audible. Several times, he hung his head or slumped in his chair. At one point, he pulled his sweatshirt over his face. Although he was offered food during both interviews, he declined to eat.

¶ 126   During both interrogations, detectives repeatedly lied to the defendant, something the majority rightly criticized. They also denied the juvenile defendant the opportunity to speak to his mother despite his repeated requests to see her. Although it is not clear whether the defendant's mother attempted to see him and was prevented from doing so, it is clear that the defendant was told his mother would not be permitted to see him or speak with him. This is particularly egregious in light of the defendant's request to contact his mother for help finding an attorney.

¶ 127   Significantly, Detective Brooks made several comments indicating to the defendant that his access to his mother depended upon his willingness to confess. At one point, Detective Brooks responded to the defendant's request to call his mother by asking if he would tell her "the truth." Later, when the defendant again asked to call his mother, Detective Brooks told him that he must

42

first tell "the rest of this story." As the majority emphasizes, Detective Brooks told the defendant that he could not specifically promise him that he would be allowed to see his mother if he confessed because that would make it "look like" the detective was "making a promise" or coercing the defendant. Detective Brooks went on to say, "I need you to tell me the truth because you want to tell me the truth." However, I do not believe this statement was sufficient to overcome the detectives' repeated statements making it crystal clear that the defendant would not be permitted to see his mother unless and until he gave a confession. A confession is not voluntary if it was " 'obtained by any direct or implied promises, however slight.' " *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).

¶ 128   Moreover, the defendant's comments suggest that he was persuaded by those statements. He asked the detectives whether they could do him a favor if he did them a favor. He later told Detective Skalsky that he just wanted to see his family and that, after that, he would tell them something. Considering this conduct along with the circumstances, I do not believe the defendant's confession was voluntary. Instead, I believe he was persuaded to tell the detectives what they wanted to hear because he knew he would not otherwise be allowed to contact his mother.

¶ 129   We also cannot overlook the particularly coercive effect the circumstances of the defendant's detention had on him as a young African American. In its June 22, 2020, Statement on Racial Justice, the Illinois Supreme Court emphasized the "frailties in our public institutions" and their "disproportionate impact" on people of color. See "Supreme Court Releases Statement on Racial Justice, Next Steps for Judicial Branch" (June 22, 2020). In addressing the role of the judiciary in alleviating these concerns, the supreme court stated as follows: "Where frailties in the disposition of justice exist, we will recognize them and acknowledge them and seek to rectify any injustice." See *id*. Here, the defendant was interrogated by three white detectives and held for 24

43

hours while police refused to allow him contact with his mother. In doing so, officers not only denied this juvenile contact with a concerned family member and assistance in retaining counsel, but they also denied him contact with anyone of his socioeconomic standing, cultural experience, and race. The voluntariness of both the defendant's decision to waive his previously invoked right to counsel and the confession he ultimately made must be judged in the context of this intimidating and coercive environment.

¶ 130   Considering the totality of these circumstances, I believe it is reasonably probable that the court would have granted a motion to suppress, either on the basis of the detectives' failure to scrupulously honor the defendant's invocation of his right to counsel or on the grounds that the confession ultimately obtained was not voluntary.

¶ 131   Finally, I agree with the majority's analysis of the defendant's remaining claims of ineffective assistance of counsel. However, because I find it reasonably probable that a motion to suppress the defendant's confession would have been granted, I reach a different conclusion regarding the probability of a different outcome at trial. I find that the defendant was prejudiced by the cumulative effect of counsel's mistakes—his failure to file a motion to suppress and his failure to object to admission of the 9-1-1 recording, the testimony about the shoeprint, and the prosecutor's argument misstating the presumption of innocence.

¶ 132   Although there was additional evidence that tied the defendant to the shooting, that evidence was not overwhelming. Three witnesses placed the defendant at the scene *before* the shooting occurred. However, all three testified that he left the area before the shooting. Only Buchanan testified to seeing the defendant at the scene when the shooting occurred. Although most of Buchanan's testimony was not directly contradicted by the testimony of the other two witnesses, their testimony that it was too dark to see anyone in the street detracted from the credibility of

Buchanan's claim that he could see the face of the defendant, a man he had never met before that evening. I therefore believe that without the improper evidence, including the defendant's confession, there is a reasonable probability of a different result at trial. For these reasons, I would reverse the defendant's conviction and remand for a new trial.